In the Matter of the ADOPTION OF Kyle Alexander KEITHLEY.

No. 55662.

Supreme Court of Iowa.

April 25, 1973.

Rehearing Denied June 25, 1973.

------

Maurice B. Nieland, of Kindig, Beebe, McCluhan, Rawlings & Nieland, Sioux City, for appellant.

James A. Schall, of Pendleton & Pendleton, Storm Lake, for appellee.

Heard before MOORE, C. J., and MASON, LeGRAND, UHLENHOPP and McCORMICK, JJ.

McCORMICK, Justice.

This is an appeal from a decree of adoption entered for a stepmother over the objection of the child's natural mother. The child involved is Kyle Alexander Keithley, nine years old (born June 7, 1963). His natural father is Gerald Keithley, divorced from his natural mother, respondent Barbara Keithley, and married to petitioner Karen Keithley. Gerald consented to Karen's petition but Barbara resisted the adoption. Trial resulted in the decree of adoption from which Barbara appeals. We reverse.

It is necessary to discuss the evidence in some detail. The facts are virtually undisputed. Gerald and Barbara were married in 1959. They were divorced in 1967 in Cherokee County where they then resided. Pursuant to her petition, which was uncontested, Barbara was awarded custody of Kyle, then four. At that time Barbara, who holds a degree in nursing, was director of education at the Mental Health Institute, Cherokee, Iowa. Gerald was manager of the local Sears store.

Barbara did not adjust to the divorce. She had been very dependent on Gerald. Evidently the divorce contributed to a loss of self-esteem. She frequently contacted Gerald for advice or attention to her problems. Gerald visited regularly with Kyle, but he was adamant that the marriage had ended and, although he was sympathetic with Barbara, he was determined to embark on a new life. He dated Karen for some time prior to their marriage in November 1968. During their dating Karen became acquainted with Kyle and fond of him. Barbara continued to have difficulties and contacted Gerald when she became depressed. Her relationship with Kyle was involved; his school work was adversely affected. She believed Gerald had always been close to his son, whereas she had not. Since she was single and employed full time she believed she could not offer Kyle as much as Gerald could after his remarriage.

After consultations with Kyle's physician and Gerald she decided in February 1969 to relinquish custody to Gerald. Confusion surrounded the transfer. She testified she wanted to tell Kyle of her decision, but Gerald took the child before she had an opportunity and did not return him as promised so she could do so. She viewed the transfer of Kyle as the "final untying" of her relationship with Gerald. Intensely troubled, Barbara took an overdose of drugs that evening in an effort to end her life. She was discovered and hospitalized for about a week. She was referred to a psychiatrist who determined she was suffering from depression. She received anti-depressant medication which was still prescribed for her at the time of trial, and she commenced counseling with Allan F. Demorest, a clinical psychologist in Fort Dodge. He saw her frequently until she moved to Omaha in June 1969, and less frequently thereafter.

Mr. Demorest testified he assisted Barbara in evaluating her self-defeating behavior to help direct her in solving her adjustment problem. Part of her difficulty was caused by self-doubt and ambivalence relating to the end of her marriage and re-

linquishing custody of Kyle. Mr. Demorest indicated he believed she was progressing well in adjustment.

Barbara started seeing Kyle about one month after giving him up. She visited with him every week or two until her move to Omaha. Barbara's new employment was as supervisor in a 150 bed psychiatric unit in an Omaha hospital.

Pursuant to stipulation between Barbara and Gerald the divorce decree was modified in May 1969 to formalize the change of custody to Gerald. His custody was made subject to "reasonable rights of visitation" of Barbara. That same month Gerald and Karen moved with Kyle to Storm Lake where Gerald took a job as a car salesman.

Visitations from June 1969 until the time of trial fall into three categories. Until October 1970 they were irregular but arranged by mutual agreement. From October 1970 until October 1971 they were infrequent and openly resisted or refused. In October 1971 specific times were fixed by modification of the divorce decree; thereafter visitations were regular but exercised in an atmosphere of tension and hostility.

Barbara testified Gerald and Karen first broached the subject of adoption with her in the summer of 1969. She refused her consent. Barbara said Kyle visited her twice in the summer of 1969, once in October, once over the Christmas holidays, and once in February 1970. Most of the visits were in Omaha. During this period Kyle was in first grade in Storm Lake and did not do well.

There were a couple of visitations in the summer of 1970. In October Kyle visited his mother over Halloween. He was badly frightened by a tour of a "haunted house." Gerald and Karen told Barbara that thereafter she would be permitted to see Kyle only at Christmas and in the summer. This started the period of open hostility by Gerald and Karen to Barbara's right of visitation. In November 1970 Kyle was seen by the school psychologist, Jack Hinzman, because of his academic and behavioral difficulties. He was tested and found to be of above average ability but afflicted with a perceptual problem. Mr. Hinzman testified he found Kyle to be "hyperactive, very distractable in the classroom" and to have "poor control of his impulses in that he would act out his behavior when he became frustrated or anxious or nervous." On his recommendation Kyle took first grade over again. Gerald and Karen gave him their version of Kyle's background and he told them Kyle would be better off with as little contact with his natural mother as possible.

Barbara was allowed to have Kyle with her four days over Christmas. She was refused subsequent visits until April 1971. Then she called Gerald under the pretext of arranging the time of summer visitation. During the conversation she told him she had only two weeks to live and would like to see Kyle. Gerald and Karen took Kyle to see her that weekend and were quite upset when she admitted after their arrival she had deceived them in order to get to see Kyle. They left Kyle for a few minutes but returned and demanded he come with them. Gerald was angry and told Barbara he would have nothing to do with her.

She took that as a refusal of future visitations with her son and on May 13, 1971, filed an application with the court to have her visitation rights determined. Gerald bought a restaurant in Orange City and moved Karen and Kyle there in May. Barbara was not allowed to communicate with Kyle. Gifts were diverted. On June 7, 1971, Karen filed her petition to adopt Kyle. Barbara's application was heard in October. The court found she had been refused visitation rights assured her by the divorce decree and granted her specific rights to have Kyle the third weekend of each month, extended to six days during the Christmas holidays, and two weeks each June. Starting in October and until

the decree of adoption entered in June 1972 Barbara was accorded the specified visitations.

Kyle continued to have difficulty in school. His second grade teacher in the Orange City school, Mrs. Patricia Muilenburg, testified she thought he was an interesting child and kept notes of her observations. She started in September 1971, prior to the resumption of visitations. She noted Kyle was easily distracted and had trouble keeping his mind on his work. He carried out his assignments. It was determined he needed glasses, which were obtained.

Mrs. Muilenburg referred him to the school psychologist, Ray Beamer, who administered psychological tests to him October 20, 1971, two days after the order concerning visitations and the very day he was to see his natural mother for the first time since the episode in April. Mr. Beamer had two counseling sessions with Kyle and observed him before and after the October visit with his mother.

He testified he found Kyle above average mentally but that after the visitation his perception changed:

"He wasn't able to get [his] work in on time. He was more nervous, quite distractable and he * * * was in a world of his own."

He added:

"Kyle told me that he wished he didn't have to go visit his mother. He said 'I feel like that I am being pulled one way and then the other.' And he says 'I wish I could remain in my present home. I like my new home. I love my new mother and I wish I didn't see my true mother.' "

Kyle told him he became upset whenever his father and mother met. Mr. Beamer concluded Kyle was emotionally insecure and in need of stability. He believed he would have a greater sense of emotional security if the adoption was granted.

Mrs. Muilenburg described Kyle's demeanor at school before and after subsequent visitations. Immediately before them he would be nervous and apprehensive. Afterward he was upset, easily distracted and frustrated. He also had trouble adjusting to a student teacher. He got into fights easily after returning from visits to his mother.

The school principal, Henry Van Aartsen, testified concerning Kyle's scores on an achievement test given in May 1971. He had three areas of average scores, one below average and two above average. Mr. Aartsen said the school had no particular discipline problem with Kyle but his teacher reported moodiness affected his achievement.

Karen testified Kyle did not enjoy the visitations with his mother. Barbara exposed him to boy friends, once took him to the opera which he did not enjoy and gave him too many gifts. Karen said Kyle was somewhat a discipline problem when custody was first transferred but soon settled down. However, she said visitations upset him during the period they lived in Storm Lake. She described him as moody and sensitive on his return from them and less responsive to discipline. She acknowledged he was making normal progress in school at the time of trial, they were having no serious disciplinary problem with him at home and visitations became less upsetting after the court order:

"I think the difference now since we have moved to Orange City is that he is resigned to the fact that these visitations have to occur since the court order and he is adjusting in that respect. I think he still shows a feeling of nervousness and distance before the visit. * * * He seems to be much more relieved upon his return that he is back * * * in his home with his family. He still takes some time to settle down. But discipline isn't the problem it was beforehand."

She said she wanted to adopt Kyle because she was serving the role of his mother,

was confident of her ability, loved him as a son, had his love as a mother, and believed the adoption would solidify their family unit.

Gerald testified Barbara had stopped her efforts to communicate with him several months before trial. He said he had refused visitations prior to the court order because he did not think Barbara could be trusted. He characterized Kyle when anticipating visitations as "withdrawn" and afterward quite affectionate. A visitation occurred the weekend before trial in March 1972. Kyle wanted to know if he could accept an invitation to stay overnight with a friend instead. Gerald testified:

"He knew that we tried to explain to him that in the court ruling * * * we must allow her to visit, so he understood that. But he didn't know. He wanted us to tell him if he could decide if he had any choice in the matter and we didn't really know. We said, well, maybe if * * * you don't want to maybe you wouldn't have to. He really got his hopes up then. Maybe it was the wrong thing to tell him, but it was all we could think of. And I was considering calling Barbara to explain that he didn't want to go to Omaha this weekend, that he would rather go to his friend's. Then he finally decided he would rather let it go and just let her come and he would go to Omaha. He evidently didn't want to hurt her feelings."

He agreed with Karen the discipline problem had been solved, but visitations were still somewhat upsetting. He said Kyle seemed to accept Karen as his mother.

In answer to a hypothetical question containing many of the facts recited by petitioner's witnesses, Mr. Hinzman testified the child's best interest would be served by granting the adoption. He believed it would enhance his security.

A co-worker of Barbara, Johanna Johnson, testified to her good opinion of her as a nurse, friend and mother. Mrs. Johnson saw Kyle during one of his visits with Barbara and thought the boy was at ease and having a good time.

Barbara testified Kyle told her he liked the visitations and had commented during the last one before trial the weekends were too short. She said they would go to the zoo, visit a ship, fly kites, go to the movies, have picnics and once went to an opera. She said she loves her son very much.

Mr. Demorest testified he could see no negative factor involved in Barbara's continuing her relationship with Kyle. He had seen Kyle once in October 1969 at his parents' request to rule out any genetic or organic disorder as cause of his school problems, which he did. He did not believe Barbara was hostile to Gerald. He did not purport to know the precise cause of Kyle's problems but said where conflict occurs between parent figures over a child it is disturbing to the child. He believed conflict over visitation might have some effect on Kyle. In the absence of conflict it was his opinion a child is not adversely affected by multiparent situations.

As to adoption, he stated it does not change emotional status of older children like Kyle who have known and developed emotional ties with the natural parent whose rights are cut off. He thought cessation of visitation would not necessarily alter emotional stress involved in the relationship.

I. The general principles governing review of adoption proceedings are well established. Our review is de novo. In determining whether the adoption should be granted we are here required to view the evidence in the light of three competing interests, the interest of the child, the interest of the natural mother and the interest of the stepmother. See Uhlenhopp, Adoption in Iowa, 40 Iowa L.

Rev. 228, 229 (1955). The welfare of the child is paramount but not the only consideration. Adoption is drastic. It is permitted only if a balancing of the competing interests shows it is wise. In re Adoption of Clark, 183 N.W.2d 179, 184 (Iowa 1971), and citations.

■ II. It is conceded by Barbara in this case that her consent will not bar the adoption if it is otherwise justified. "[W]hen the natural parents are not married to each other, the noncustodial parent does not possess power to veto adoption because he possesses visitation rights; nor does he have veto power unless he materially provides the child's needs." In re Adoption of Clark, supra. Thus the sole issue here is the wisdom of the adoption.

III. It is not as easy to unmake a marriage as to enter it. For those to whom the relationship has been an entire commitment of personality, its dissolution has an emotional as well as intellectual impact. This impact is especially great for someone who has become or is by nature very dependent. Thus, it is obvious the termination of Barbara's marriage was an emotionally shattering experience for her and she had trouble coping with it. Gerald was not so affected. Barbara finally made the adjustment.

Where a child is involved the end of the marriage is also the end of a family. The child is an innocent bystander. Usually he has love for both his parents and they for him. When they are divided by conflict, so are his emotions. Of course such conflict may occur before and after the marriage ends. In the present case we do not know what wounds were inflicted on Kyle before his parents divorced, but we have much evidence of the effect of subsequent conflict.

When a new parent figure enters the picture as with Karen's marriage to Gerald, what becomes a fresh start for the parent who remarries may present a new problem for the child. It is impossible to pretend the previous family circle did not exist where the child knows otherwise. And where in the new situation the noncustodial parent becomes an unwelcome intruder the child's feelings are torn. As we said in In re Adoption of Clark, supra, at 185, "Sometimes the trouble does not arise because the children are upset but because the adults are upset."

We have little evidence here of any conscious effort by Gerald and Karen to wean Kyle from his mother. But the evidence is overwhelming that they viewed her visitations as first an unpleasantness to be tolerated, later as a threat to be resisted and finally as a court-imposed right to be legally challenged in this adoption proceeding. In such an atmosphere it is no wonder he suffered.

There is little doubt Gerald and Karen are well-meaning. They obviously believe if Barbara can be cut out of Kyle's family circle he will be better off. At least unconsciously they have maintained that position since shortly after Gerald received Kyle's custody. Because of this they have not acted affirmatively to foster Kyle's relationship with Barbara. They have dangled the prospect before him that his life can be made less complicated if Barbara is not part of it. The result has been increased turmoil for Kyle.

The evidence also shows that when the court imposed specific, regular and more frequent visitation periods, which could not be avoided, Kyle was less disturbed than when they were irregular, infrequent, uncertain or refused. This was true even though he knew the adoption petition was pending.

■ We believe there are three choices involved in adjusting this problem. One is to grant the adoption. The second is to deny the adoption but eliminate Barbara's visitations, which are the premise upon

which the case for adoption is built. The third is to deny the adoption and ask the three adults involved to face up to their responsibilities, end their conflict and affirmatively accept the realities of the situation.

The first choice, made by the trial court, would serve Karen's interest and deny Barbara's. Whether it would serve Kyle's interest in the long range is highly debatable. It could not alter the past, and is not likely to make him forget it at his age. The second choice would have a similar result and perhaps only postpone the problem. The third choice is the one we make. We believe Kyle is entitled to continue to know and love Barbara as his natural mother, and she is entitled to continue to know and love him as her son. He is entitled to continue to know and love Karen as his stepmother, and she is entitled to continue to know and love him as her stepson. So far as the record discloses Barbara was a good mother to Kyle for the more than five years he was with her. She has maintained a wholesome interest in him and has only fought for visitation and retention of her parental tie. We are persuaded it is not the visits with his mother that upset Kyle but his knowledge they are unwelcome to Gerald and Karen. All of the expert testimony has focused on the conflict among these adults as the problem rather than his relationship with his mother. We think the better solution is to end the conflict and not the relationship. This is not an extreme case where the only reasonable way to resolve the conflict would be to sever the relationship.

The record demonstrates the adults in this case have the capacity and interest in Kyle to build a future for him based on love rather than conflict. We believe they should do so.

The adoption should not have been granted. The case is reversed.

Reversed.