CATHOLIC CHARITIES OF the
ARCHDIOCESE OF DUBUQUE,
Iowa, Appellant,

v.

Joseph ZALESKY, Appellee.

No. 2–56720.

Supreme Court of Iowa.

Aug. 29, 1975.

540

Alfred E. Hughes, Dubuque, for appellant.

James L. Chipokas, of Chipokas, Koehler, Platt & Merrifield, Cedar Rapids, for appellee.

RAWLINGS, Justice.

Plaintiff, Catholic Charities of the Archdiocese of Dubuque, Iowa, appeals from trial court's declaratory judgment holding The Code 1971, Sections 238.26–238.28 and 600.3 relating to adoptions and child placements for such purpose are unconstitutional. We reverse.

June 16, 1971, Baby Boy Cox was born out of wedlock to Karen Ann Cox. Defendant, Joseph Zalesky, is the natural father of this child. These parents were never married.

June 21 Miss Cox executed a release of parental rights (permanent care and custody) to plaintiff, a licensed child-placement agency. Thereafter plaintiff commenced adoption proceedings. July 11, 1972, the adoption was finalized. It is conceded defendant's consent to a termination of his parental rights or the subsequent adoption was not obtained, nor was he afforded notice and opportunity to be heard in either of these related matters prior to finalization of said proceedings.

November 13 plaintiff commenced the instantly involved declaratory judgment action seeking an adjudication as to validity of the aforesaid adoption. December 20 defendant filed answer thereby attacking Code §§ 238.26–238.28 (child placement statutes) and § 600.3 (adoption statute) as violative of equal protection and due process.

In relevant part chapter 238, particularly §§ 238.26–238.28 prescribe the manner in which a voluntary termination of parental rights may be effectuated and custody of a minor transferred to a child-placement agency.

Section 238.26 says: "No person may * * * transfer to another his rights, or duties with respect to the permanent care or custody of a child * * * unless * * the parent or parents sign a written release * * * of the * * * custody of the child to [a child-placement] agency * *."

Section 238.27 declares: "Neither parent may sign such release without the written consent of the other unless * * * the parents are not married to each other."

Section 238.28 states: "If the parents are not married to each other, the parent having the care and providing for the wants of the child may sign the release."

Chapter 600 prescribes procedures relative to direct adoption of a child or through a child-placement agency.

In relevant part § 600.3 says:

"The consent of both parents shall be given to * * * [an] adoption unless * * * the parent or parents have signed a release of the child in accordance with the statute on child placing. * * If the child has been given by written release to a licensed child welfare agency in accordance with the statute on child placing, the consent of the agency to whom the release was made shall be necessary."

July 30, 1973, trial court held §§ 238.26–238.28 and 600.3, quoted above, violate equal protection and due process, as alleged by defendant, because they permit termination of parental rights of a putative father without first requiring his consent or affording him notice and opportunity to be heard. In brief, trial court's holding was premised on *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Rothstein v. Lutheran Social Services*, 405 U.S. 1051, 92 S.Ct. 1488, 31 L.Ed.2d 786 (1972); *Vanderlaan v. Vanderlaan*, 405 U.S. 1051, 92 S.Ct. 1488, 31 L.Ed.2d 787 (1972).

In support of a reversal plaintiff contends trial court erred in holding the above cited statutory enactments are unconstitutional.

■ I. Since the filing of this appeal both parties hereto have conceded defendant has formally consented to the aforesaid adoption of Baby Boy Cox. By reason thereof the case now before us is moot. See *Board of Directors Ind. Sch. Dist. v. Green*, 259 Iowa 1260, 1264–1265, 147 N.W.2d 854 (1967).

II. Despite the above holding we have said that where, as here, "the issue presented is of substantial public interest there exists a permissible exception to the general rule that a case which has become moot or presents only an academic question will be dismissed on appeal." *Board of Directors Ind. Sch. Dist. v. Green*, 259 Iowa at 1264, 147 N.W.2d at 856.

In this vein it is evident trial court's decree places a cloud upon Code chs. 238 and 600 and will, in effect, jeopardize all adoption proceedings whether previously completed, now in process or which may be hereafter instituted. Therefore, an adjudication as to constitutionality of the statutes above cited is deemed to be a matter of public concern, desirable for guidance of our trial courts or other public officers and bodies and all concerned citizens, and necessary because of a likelihood the same problem instantly presented may recur.

Under these circumstances we conclude the issues at hand should be now entertained by this court, albeit in the abstract.

III. At the outset these guiding standards set forth in *Keasling v. Thompson*, 217 N.W.2d 687, 689–690 (Iowa 1974) come into play:

"Ordinarily, statutes, with notable exceptions not here involved, regularly enacted by the legislature will be accorded a strong presumption of constitutionality and all reasonable intendments must be indulged in favor of the validity of the legislation attacked. One who challenges legislation on constitutional grounds has the burden to negate every reasonable basis upon which the statute may be sustained. Where the constitutionality of a statute is merely doubtful or fairly debatable, the courts will not interfere. Thus a statute will not be declared unconstitutional unless it clearly, palpably and without doubt, infringes the constitution. *Hearth Corporation v. C–B–R Development Co., Inc.*, Iowa, 210 N.W.2d 632, 636, 637; *State v. Vick*, Iowa, 205 N.W.2d 727, 729, and the many authorities cited in these opinions. The legislature is given wide discretion in defining the limits of classes when a statute involves classification of persons or things. If a classification is reasonable and operates equally upon all within the class, it is a valid classification. *Brown Enterprises, Inc. v. Fulton*, Iowa, 192 N.W.2d 773, 776 and citations.

"The judicial branch of the government has no power to determine whether legislative Acts are wise or unwise, nor has it the power to declare an Act void unless it is plainly and without doubt repugnant to some provision of the Constitution. *Graham v. Worthington*, supra, 259 Iowa 845, 850, 851, 146 N.W.2d 626, 631."

IV. As an additional preface to our consideration of the constitutional issues here presented an evaluation of *Stanley, supra*, is deemed appropriate.

There a man and woman, though not married, had lived together intermittently for eighteen years. Three children were born to them. When the mother died two of the children were adjudged to be dependents of the state. The known father was accorded no opportunity to be heard on the issue as to termination of his parental rights.

The involved Illinois law allowed all statutorily defined "parents" to be heard on the matter of fitness prior to termination of custodial rights. But the father of an illegitimate child was not included within the definition of "parent".

*Stanley* appealed the parent-child termination judgment to the Illinois Supreme Court. See *In re Stanley*, 45 Ill.2d 132, 256 N.E.2d 814 (1970). He there argued the exclusion of unwed fathers from the statutory definition of parent violated equal protection. This argument was rejected by the Illinois high tribunal. Thereupon the United States Supreme Court, having granted certiorari, reversed and held a proceeding which culminated in termination of an unwed father's custody of his child without notice and opportunity to be heard violated

equal protection and due process. This holding was reached by first considering the Illinois statutes under due process, then employing such analysis as a basis for finding denial of equal protection.

As to due process the Court, upon recognizing a putative father's interest in his illegitimate child, balanced the private and public interests against one another. In so doing the Court observed that when the state separates a putative father from his child without a hearing such parent is deprived of a legally protected right without furthering the public interest in any substantial way. It was consequently held, absent noticed hearing, the statutory method by which Illinois had chosen to implement its state interest unreasonably interfered with the putative father's rights.

And, having determined such a parent's rights could not be thus cursorily terminated, the court reasoned that since all married Illinois parents were statutorily entitled to a fitness hearing prior to being separated from their children, it was a denial of equal protection to deny the same right to a putative father.

Two state court decisions involving issues raised in *Stanley*, were remanded for consideration in light of that opinion and thereupon vacated. See *State ex rel. Lewis v. Lutheran Soc. Serv. of Wis. & Upper Mich.*, 47 Wis.2d 420, 178 N.W.2d 56 (1970), vacated sub. nom. *Rothstein v. Lutheran Social Services*, 405 U.S. 1051, 92 S.Ct. 1488, 31 L.Ed.2d 786 (1972); *Vanderlaan v. Vanderlaan*, 126 Ill.App.2d 410, 262 N.E.2d 717 (1970), vacated 405 U.S. 1051, 92 S.Ct. 1488, 31 L.Ed.2d 786 (1972). See also *Cheryl Lynn H. v. Superior Court for City of Los Angeles*, 41 Cal.App.3d 273, 115 Cal.Rptr. 849 (1974); *People ex rel. Slawek v. Covenant Children's Home*, 52 Ill.2d 20, 284 N.E.2d 291 (1972); *Doe v. Department of Social Services*, 71 Misc.2d 666, 337 N.Y.S.2d 102 (1972). See generally *In re Adoption of Anonymous*, 78 Misc.2d 1037, 359 N.Y.S.2d 220 (1974); *In re M.*, 132 Vt. 410, 321 A.2d 19 (1974); *Slawek v. Stroh*, 62 Wis.2d 295, 215 N.W.2d 9 (1974).

V. Mindful of the foregoing we turn now to the matter of equal protection under the Iowa statutes quoted above.

■ It is at once evident these enactments do not discriminate as in *Stanley* by drawing lines of distinction regarding consent to adoption or release of a child to an agency for such purpose on the basis of parental status. Rather, any parent, married, single, divorced, male or female stands in like position. The only line of demarcation is between the caring and noncaring parent.

■ Noticeably, the aforesaid statutes provide two methods by which adoption may be effectuated. See *Stotler v. Lutheran Social Service of Iowa*, 209 N.W.2d 121, 125 (Iowa 1973). And since the laws applicable thereto are in pari materia they are so considered. See *State v. Bartz*, 224 N.W.2d 632, 635 (Iowa 1974); 73 Am.Jur.2d, Statutes, §§ 188–190; 82 C.J.S. Statutes § 366c(1).

Code ch. 238 allows release of a child under 14 to a licensed placement agency for purpose of adoption only with the consent of both parents subject to designated exceptions neither here relevant nor considered. Significantly, however, where the parents are not married the parent providing for wants of the child "may sign the release". And by § 600.3 a parent similarly situated may consent to a direct adoption by designated adoptive parents. See *Stotler v. Lutheran Social Service of Iowa, supra*. See also H. Uhlenhopp, "Adoption in Iowa", 40 Iowa L.Rev. 228 (1955).

■ Therefore, the determinative factor under Iowa law regarding direct adoption of a child by designated adoptive parents, release of a child to a child-placement agency, or adoption of a child placed by such agency is whether a nonconsenting parent has provided for wants of his or her offspring. See *In re Adoption of Keithley*, 206 N.W.2d 707, 711–712 (Iowa 1973); *Rubendall v. Bisterfelt*, 227 Iowa 1388, 1390–1391,

291 N.W. 401 (1940). See also Code §§ 675.1 and 675.29.

The question thus posed is whether the statutory classification of "caring" versus "noncaring" parent passes constitutional muster.

■ In this regard, it is understood the various states have authority to statutorily treat different classes of persons in differing ways, provided such classification is reasonable, not arbitrary, and rests upon some ground of difference having a fair and substantial relation to the object of the legislation so as to treat alike all persons similarly circumstanced. See *Reed v. Reed*, 404 U.S. 71, 75, 92 S.Ct. 251, 253, 30 L.Ed.2d 225 (1971).

To like effect is this observation in *State v. Hall*, 227 N.W.2d 192, 194 (Iowa 1975):

"The legislature is given wide discretion in defining the limits of classes when a statute involves classification of persons or things. If a classification is reasonable and operates equally upon all within the class, it is a valid classification. *Keasling v. Thompson*, supra; *Brown Enterprises, Inc. v. Fulton*, Iowa, 192 N.W.2d 733, 776 and citations.

"In *Lunday v. Vogelmann*, Iowa, 213 N.W.2d 904, 907, we say:

" '[T]he classification must be sustained unless it is patently arbitrary and bears no rational relationship to a legitimate governmental interest. *Id.* It does not deny equal protection simply because in practice it results in some inequality; practical problems of government permit rough accommodations; and the classification will be upheld if any state of facts reasonably can be conceived to justify it. *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491, 501–502 (1970). The legislature has wide discretion in deciding classifications. *Cedar Mem. Park Cem. Ass'n v. Personnel Assoc., Inc.*, 178 N.W.2d 343, 350 (Iowa 1970). * * *.' "

■ Surely the sovereign, as parens patriae, has a legitimate socio-humanitarian interest in every child within its boundaries. And this state interest perforce attaches to all adoption proceedings. See *Stanley v. Illinois*, 405 U.S. at 652, 92 S.Ct. at 1213; *Jefferson v. Hackney*, 406 U.S. 535, 546–547, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1972); *In re McDonald*, 201 N.W.2d 447, 453 (Iowa 1972); *Helton v. Crawley*, 241 Iowa 296, 310–315, 41 N.W.2d 60 (1950); 2 Am.Jur.2d, Adoption, § 3; 2 C.J.S. Adoption of Persons §§ 3, 5; cf. *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 560–563, 42 L.Ed.2d 532 (1975).

■ It is to us evident the difference between caring and noncaring parents bears a rational relationship to a state objective sought to be advanced by the above quoted Iowa statutes. Phrased otherwise, such statutory differentiation is not patently arbitrary and does rationally relate to a legitimate governmental interest, i. e., promotion of the welfare and best interests of all children within the state. See *In re Adoption of Keithley*, 206 N.W.2d at 712.

Illustratively, the father in *Stanley*, supra, was a known caring parent. Therefore, had the *Stanley* case been presented to a court in this jurisdiction the unmarried father's rights would have been accorded appropriate recognition under applicable Iowa law. In other words, he would have been here afforded equal protection.

We now hold Code §§ 238.26–238.28 and 600.3 do not violate constitutional equal protection mandates.

VI. The next issue to be resolved is whether the above quoted statutes meet procedural due process of law requirements.

With little or no question *Stanley, supra,* generally requires that a known putative father must consent to an adoption of his offspring, otherwise notice be given and right to hearing accorded him before his parental rights can be terminated. See *Protecting the Putative Father's Rights After Stanley v. Illinois: Problems in Implementation,* 13 J. Family Law 115, 125–

132 (1973–1974); *Stanley v. Illinois: Constitutional Rights of a Putative Father,* 41 UMKC L.Rev. 334, 345–347 (1972). And as best determinable the majority of courts applying *Stanley* have so held. See *Cheryl Lynn H. v. Superior Court for City of Los Angeles; People ex rel. Slawek v. Covenant Children's Home; In re Adoption of Anonymous; Doe v. Department of Social Services; Slawek v. Stroh,* all *supra   In re Guardianship of Donna P.,* 80 Misc.2d 129, 362 N.Y.S.2d 370 (1974).

Moreover, Code § 600.4 says, in relevant part: "The Court shall provide for such hearings in adoption proceedings as may be necessary and shall prescribe notice thereof."

Mindful of the foregoing, we are satisfied an effective adjudication cannot hereafter be entered in any proceeding involving either (1) direct adoption to designated adoptive parents or (2) adoption of a child through a child-placement agency, premised upon parental release of the child for such purpose, unless an identity and address known nonconsenting putative father is accorded appropriate timely notice and opportunity to be heard. This means, absent consent to any release for or adoption of a child born out of wedlock, such known father must be accorded meaningful opportunity to show he has significantly provided for the wants of his child and is ready, willing and able to thus provide for future wants of said child before a court can effectively terminate his parental rights. See *Cedar Rapids, Etc. v. Cedar Rapids Commun. Sch.,* 222 N.W.2d 391, 401–402 (Iowa 1974); Code § 600.4; 16 Am. Jur.2d, Constitutional Law, § 569; 16A C.J.S. Constitutional Law §§ 619, 622. See also footnote 9 in *Stanley v. Illinois,* 405 U.S. at 657, 92 S.Ct. at 1216; Code § 600.3.

Understandably, however, a noticed-in nonconsenting putative father shall not have the initial burden of proof. Rather, the petitioner shall have the initial burden of pleading and proving the individual named is the father of the subject child.

The named father shall, however, have the burden of pleading and proving, in the sense of the risk of nonpersuasion, he has been and is providing for the wants of said child. This risk of nonpersuasion shall at all times remain with the putative father. See *Van Horn v. Iowa Public Service Company,* 182 N.W.2d 365, 370 (Iowa 1970); Iowa R. Civ.P. 344(f)(5)(6); 9 Wigmore on Evidence, §§ 2485, 2487 (1940); 1 Jones on Evidence, §§ 5:1–5:2 (6th ed. 1972); McCormick on Evidence, §§ 336, 337 (2d ed. 1972). See also *In re Adoption of Vogt,* 219 N.W.2d 529, 531 (Iowa 1974).

It is to us apparent the aforesaid requisite noticed hearing as to such known putative father is clearly contemplated by the above quoted statutes and deemed to be an inherent part thereof. This court has never determined otherwise and now concludes the involved statutory enactments must be so interpreted. See *Terminiello v. City of Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949); *Wright v. City of Montgomery, Alabama,* 406 F.2d 867, 874 (5th Cir. 1969); *State v. Lavin,* 204 N.W.2d 844, 848–849 (Iowa 1973); *In re Whetstone,* 137 Fla. 712, 188 So. 576, 579 (1939); *Carpenter v. Forshee,* 103 Ga.App. 758, 120 S.E.2d 786, 791–793 (1961). See also *Osborne v. Edison,* 211 N.W.2d 696, 697 (Iowa 1973); *State v. McGuire,* 200 N.W.2d 832, 833 (Iowa 1972); *Janson v. Fulton,* 162 N.W.2d 438, 442–443 (Iowa 1968); Code §§ 4.2, 600.4, quoted *supra;* 2A Sutherland, Statutory Construction, § 45.11 (Sands 4th ed. 1973); 2 Am.Jur.2d, Adoption, § 55 at 905; 16A C.J.S. Constitutional Law § 619.

VII. Pursuing the matter at hand one more step we also hold the notice to be given such known putative father may be in such mode or manner as the trial court deems appropriate and shall in each case prescribe, including notice by certified mail, subject to constitutional due process requirements. See footnote 9 in *Stanley v. Illinois, supra.* See also Code §§ 232.4–232.-9, 232.45, 600.4; Code ch. 618; Iowa R.Civ.P. 56 (renumbered 56.1 as of July 1,

1975), 57, 58, 59 (as amended effective July 1, 1975), 59.1 (effective July 1, 1975); 16 Am.Jur.2d, Constitutional Law, § 560; 16A C.J.S. Constitutional Law § 569(4)b.

More specifically, any notice so judicially prescribed must be such as is reasonably calculated, under all the circumstances, to apprise such known putative father regarding pendency of the adoption-related proceedings involved and afford him reasonable opportunity to appear and be heard.

■ Further in this regard, such known nonconsenting putative father cannot be heard to complain if, upon reasonable notice given, he does not appear or appearing fails, as aforesaid, to show he has been and is providing for the wants of his child and the subject adoption is accorded judicial approval. See footnote 9 in *Stanley, supra;* dissenting opinion in *State ex rel. Lewis v. Lutheran Social Servs. of Wis.,* 207 N.W.2d at 834; *In re Asterbloom's Adoption,* 165 P.2d at 160. See generally 28 Am.Jur.2d, Estoppel and Waiver, §§ 26–28; 31 C.J.S. Estoppel § 59.

VIII. At this juncture we focus upon the problem regarding noticed-hearing rights of a putative father, in adoption-related proceedings, whose name or address is unknown. On that subject a relevant observation in 59 Va.L.Rev. 517 (1973) becomes pertinent. As there stated, at 529–531:

"[T]he Constitution does provide sufficient latitude to deal with the problem of the unknown putative father. A construction of the due process clause which would place insurmountable obstacles in the way of an efficient adoption system is neither justifiable nor constitutionally required. The class of putative fathers is diverse, but in this respect not unique. In *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) the Court sought protection of the property interests of beneficiaries of a common trust. The persons affected by the trustee's settlement of accounts were numerous and widely dispersed. The names and addresses of many potential beneficiaries were unknown to the trustee, yet before a court could render a final decree it was required to provide these individuals with constitutionally sufficient notice of the proceedings. The Supreme Court held that notice of the trust settlement must be mailed to beneficiaries known to the trustee [*Mullane, supra,* 339 U.S. at 318, 70 S.Ct. at 659]. However, as to those who were unknown, the Court held newspaper publication constitutionally sufficient. [Id.]

"To some extent this flexible treatment of a group of individuals whose interests are distinguishable only in terms of the different practical problems of notice they present is apposite to the problem presented by the putative father. But in the adoption context, unless the name of the father is available, a newspaper description of the interest threatened by judicial proceedings provides less protection and is less practicable than in *Mullane.* If mother and child are to remain anonymous in keeping with the necessary practices of adoptive placement [see Code §§ 600.8–600.10], notice of the adoption appearing in a newspaper cannot provide the information necessary to apprise an unidentified father that his parental interests are to be terminated. Thus, while traditional forms of constructive notice are useful elsewhere, they lack utility in the adoption context.

"Nevertheless, the rationale for constructive notice is helpful in resolving the problem of notice to the unknown putative father. The Supreme Court has said that the 'general principle invoked is that the law imputes knowledge when opportunity and interest, coupled with reasonable care, would necessarily impart it.' [*United States v. Shelby Iron Co.,* 273 U.S. 571, 580–581, 47 S.Ct. 515, 519, 71 L.Ed. 781 (1927)]. To the end of informing one who is exercising reasonable care in behalf of his interests, newspaper no-

tice provides only a modicum of added protection.

"The impending birth of an illegitimate child carries the potential for warning the putative father of the possibility of forthcoming proceedings which will affect his rights. As the child's procreator, the putative father bears responsibility for his offspring's well-being. [See Code § 675.-1] It should be clear to him that this responsibility must be assumed, and that his failure to do so will result in the state's assuming responsibility for the child. Given this opportunity for knowledge, it is reasonable to permit self-information as the unknown putative father's sole means of notice.

"Such a solution of course involves a shift in the focus of constructive notice away from the appendage of newspaper publication toward emphasis on the basic duty of self-inquiry. It assumes that, under circumstances where the only alternative is to compromise the other significant interests involved, self-inquiry alone may constitute constitutionally sufficient notice. Yet such a shift is not a radical one. The law is under no illusion as to the effectiveness of such devices as newspaper publication. The Supreme Court has remarked that the chance of an interested party's receiving actual notice is indeed slight. [*Mullane, supra,* 339 U.S. at 315, 70 S.Ct. at 658]. The odds become greater when the name of the interested party is unknown and consequently cannot be included. [*Mullane, supra,* 339 U.S. at 317, 70 S.Ct. at 659]. Nor does the Constitution require embarrassing, expensive, and time consuming investigations to ascertain the name and location of the putative father so as to obviate the need for newspaper publication altogether. [Id.] The limited practical protection afforded by traditional constructive notice techniques eases the decision to deemphasize them. And when employing newspaper notice threatens significant harm to all the other interests, the conclusion becomes compelling.

"The practical effect of requiring self-inquiry notice is that the concerned putative father would be the one most often receiving actual notice of impending adoption proceedings. The cooperative mother would identify him, and he would receive formal notice from the family court. Similarly, the unnamed partner in a de facto marriage would be aware of his child's status and through self-information learn of pending legal proceedings affecting his parental interests. Like Peter Stanley, he would come forward of his own initiative. On the other hand, if the putative father had engaged in a brief sexual encounter with the mother, it is unlikely that he would take the trouble to inform himself, and hence would likely be unaware of proceedings for the adoption of his child.

"While lacking the amenities of a more formal constructive notice system, this solution seems constitutionally sound. * * * it protects those putative fathers who are most worthy of consideration. Admittedly, one can conjure up hypothetical situations in which this proposed solution provides no protection to the interested but unidentified putative father. These situations occur more frequently to the imagination than in fact. The group of unknown putative fathers who are unaware of the mother's intentions to place the child, yet are concerned for the child's welfare, is small. Even smaller is the group of unknown putative fathers unaware of the pending adoption who are likely to prevail if a hearing is given them."

■ Briefly stated, a notice by publication to an identity or address unknown putative father, within the ambit of adoptions, would ordinarily be an exercise in futility. See generally *Grand River Dam Authority v. Going,* 29 F.Supp. 316, 325 (N.D.Okl. 1939). It would also needlessly embarrass all concerned, particularly the unwed mother, and unjustifiably violate the rule of confidentiality which usually attends such

proceedings, all for little or no fruitful purpose.

■ In light of the foregoing, we conclude and hereby hold that where, in any adoption-related proceeding, a showing is made upon which the court reasonably concludes the name or address of the father of a child born out of wedlock is not known, then the court, upon appropriate findings and order entered of record, may dispense with the giving of notice to such parent.

No such notice-dispensing order shall be entered, however, absent the timely prior meaningful appointment of a guardian ad litem for the person of the affected child. See Code § 600.3; *In re Estate of Wadst,* 209 Iowa 1200, 1204–1206, 229 N.W. 835 (1930); *Hopkins v. Gifford,* 309 Ill. 363, 141 N.E. 178, 180–181 (1923). See also Code §§ 232.2(8)(d), 232.11; Iowa R.Civ.P. 13, 14.

IX. Since this is a case of first impression with us, the question as to retroactivity versus prospectivity of our holding regarding noticed hearing should be now resolved.

At the threshold it is understood innumerable adoptions have been heretofore finalized in this jurisdiction without the noticed hearings to which we today accord recognition. And if such requirements were to be applied retroactively the impact would be chaotic. Surely the interests of society, tranquility of many homes, and rights of numberless children presently enjoying a wholesome family environment outweighs any procedural flaws which may have attended such previously effected adoptions. Stated otherwise, a retroactive application of our adoption statutes, as instantly interpreted, would produce such self-evident hardships as to defy all dictates of justice under law.

■ Consequently, our holdings, *supra,* shall neither nullify nor apply adversely (1) to any adoption which has been finalized or (2) to any case where the mother has released the child for adoption, prior to the filing of this opinion. See *Great Northern Ry. Co. v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 363–366, 53 S.Ct. 145, 148–149, 77 L.Ed. 360 (1932). See also *Gosa v. Mayden,* 413 U.S. 665, 685, 93 S.Ct. 2926, 2938, 37 L.Ed.2d 873 (1973); *Chevron Oil Company v. Huson,* 404 U.S. 97, 106–107, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971); *Cipriano v. City of Houma,* 395 U.S. 701, 706, 89 S.Ct. 1897, 1900–1901, 23 L.Ed.2d 647 (1969).

X. In summary, we here hold Code §§ 238.26–238.28 and 600.3 comport with constitutional requirements regarding (1) equal protection and (2) procedural due process as said enactments are instantly interpreted.

Costs are taxed to plaintiffs. See Court rule 23.

Reversed.

MOORE, C. J., and MASON, LeGRAND and McCORMICK, JJ., concur.

REYNOLDSON, REES and HARRIS, JJ., concur specially.

UHLENHOPP, J., dissents in part.

REYNOLDSON, Justice (concurring specially).

I agree with the result reached by the majority but concur specially out of concern that the majority's opinion goes further than required by *Stanley.* The danger lies in an over-extension of *Stanley* and a lemming-like march to the social disaster lurking in that decision's dicta.

It is now apparent some of the sweeping language in *Stanley* was written without benefit of either proper presentation of countervailing state interests or other individual constitutional interests, e. g., the importance of legally secure adoptions, invasions of constitutional right to privacy of unwed mothers and their children resulting from third-party service of revealing notices and "to-whom-it-may-concern" published notices, need for anonymity between natural and adoptive parents, emotional trauma to unwed mothers caused by litigation and uncertainty, detrimental psycho-

logical effects on illegitimate children flowing from changes in environment and delayed permanent placements, the prospective (and now reported) congestion of foster care facilities by children once thought legally free for adoption, the danger of illegitimate children becoming pawns in contests for A.D.C. payments, and the probability of blackmail and extortion by an unknown number of conscienceless unwed fathers. See Comment, 59 Va.L.Rev. 517 (1973).

That such dicta is seldom carved in stone is now demonstrated in the sudden concern evidenced by the United States Supreme Court in *Rothstein v. Lutheran Social Services,* 405 U.S. 1051, 92 S.Ct. 1488, 31 L.Ed.2d 786 (1972) (vacating judgment and remanding in *State v. Lutheran Social Services,* 47 Wis.2d 420, 178 N.W.2d 56 [1970]) that the case should be reconsidered in light of *Stanley* but "with due consideration for the completion of the adoption proceedings and the fact that the child has apparently lived with the adoptive family for the intervening period of time." The Wisconsin court, accepting the invitation, held after remand on final appeal the "putative" father had abandoned the child before its birth. *State ex rel. Lewis v. Lutheran Social Services,* 68 Wis.2d 36, 227 N.W.2d 643 (1975).

Regardless of the permissible interpretation of *Stanley* that it resulted from a facial attack on the Illinois statutes and not an attack on the statute as applied, it is obvious the unique factual setting—an unwed parent with custody and furnishing support—motivated the majority decision. The first two sentences of the opinion demonstrate the court's preoccupation with the factual posture of the case. And in the final analysis, the interest protected in *Stanley* was "The private interest * * * of a man in the children he has sired *and raised* * * *." 405 U.S. at 651, 92 S.Ct. at 1212, 31 L.Ed.2d at 558. (Emphasis supplied.)

Stripped of its non-essentials, *Stanley* simply proscribed a statutory *conclusive* presumption that an unwed father was unfit to rear his progeny so as to deprive him of children *in his custody* without notice and hearing.

I. *Notice.*

I agree *Stanley* may be construed as establishing a due-process requirement for some type of notice to a non-consenting father in adoption-related proceedings. But "[o]nce it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 494 (1972); *Goss v. Lopez,* 419 U.S. 565, 575, 95 S.Ct. 729, 738, 42 L.Ed.2d 725, 737 (1975). See also *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

"It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands. * * * To say that the concept of due process is flexible does not mean that judges are at large to apply it to any and all relationships. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure."

—*Morrissey v. Brewer,* 408 U.S. at 481, 92 S.Ct. at 2600, 33 L.Ed.2d at 494.

In the vast majority of these situations, involving nonmarriage births followed by the mother's attempted release of the child for adoption, we are balancing the recognized fundamental and personal right of privacy of a mother who has put her life on the line to bear the child [see *Roe v. Wade,* 410 U.S. 113, 152–153, 93 S.Ct. 705, 726–727, 35 L.Ed.2d 147, 176–177 (1973); *Doe v. Rampton,* 366 F.Supp. 189, 193 (D.Utah 1973)], and the child's fundamental and personal right of privacy not to be advertised as illegitimate, against the still-undefined constitutional rights of a father whose parenting potential has been manifested only by his demonstrated ability to conceive a child out of wedlock. In my view, the due

process required by whatever countervailing rights the father possesses should be narrowed to accommodate the far superior interests of the mother and child.

The majority has already marked the essential futility of a "to-whom-it-may-concern" notice in the case of a "putative" father whose identity or address is unknown. Balanced against such publication is the emotional and psychological trauma occasioned to the new mother by the unnecessary publicity, and violation of our state policy of privacy, anonymity and confidentiality in such proceedings, evidenced by our statutes. See §§ 232.27, 232.55, 232.57, 600.9, The Code.

In the case of identity-known "putative" fathers with a last-known address, a timely notice by restricted certified mail pursuant to § 618.15, The Code, should satisfy minimum due process requirements. Any notice delivered to a sheriff in this state for service becomes a matter of public record, and in rural county courthouses (which most courthouses in Iowa are), a potential subject of public information and discussion. The majority opinion permits restricted certified mail notice. But because many Iowa trial judges may have over-reacted to *Stanley*, I submit we should specify such service is sufficient in all cases.

It should be kept in mind that in the case of a non-caring or abandoning parent the express terms of our adoption statutes either require no notice or permit court waiver of notice. Sections 600.3, 600.4, The Code. In the case of severance of parent-child relationship, certified mail is permitted where the court deems personal service impractical. Sections 232.8, 232.45, The Code. Personal service of notice would cause embarrassing publicity to the mother, unnecessary publicity concerning the child's status, and breach the state policy of confidentiality and anonymity and we should declare such notice impractical, justifying notice by restricted certified mail. This interpretation of our statutes will satisfy the obscure constitutional requirements of *Stanley*.

## II. *Hearing.*

Nor am I convinced, as the majority and Justice Uhlenhopp apparently are, that such a non-caring "putative" father who does not have custody is so presumptively qualified as a parent that some other person or organization must assume the burden to prove his unfitness.

Such a result is not dictated or even suggested by *Stanley*, as the United States Supreme Court has recognized in its later references to that opinion. *Stanley* has been capsulated by the court as holding simply "that the State could not conclusively presume that any particular unmarried father was unfit to raise his child; the Due Process Clause required a more individualized determination." *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 645, 94 S.Ct. 791, 799, 39 L.Ed.2d 52, 63 (1974); see also *Vlandis v. Kline*, 412 U.S. 441, 447, 93 S.Ct. 2230, 2234, 37 L.Ed.2d 63, 69 (1973) and *United States Dept. of Agriculture v. Murry*, 413 U.S. 508, 513–514, 93 S.Ct. 2832, 2835, 37 L.Ed.2d 767, 773 (1973).

The constitutional requirements articulated in *Stanley* and other United States Supreme Court decisions merely mandate that statutory presumptions be rebuttable; we need not go further and hold that there can be no presumptions at all with regard to putative fathers, much less need we judicially create a presumption unwed and non-caring fathers are prima facie fit parents.

We are brought back to the inescapable and as yet unanswered question: how many constitutional rights can be posited on the flimsy foundation of what is frequently only a casual sexual encounter? In this connection, it should be noted the decisions which upon superficial inspection might be interpreted as authority for lifting the proof burden from the "putative" father actually involve different factual backgrounds. See, e. g., *Armstrong v. Manzo*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965), concerning the rights of one whom the court termed a "legitimate parent": the

divorced father of a child born in wedlock. A parent of similar status was the concern of this court in *In re Adoption of Vogt,* 219 N.W.2d 529 (Iowa 1974).

The tension between conflicting interests must be resolved with certain basic concepts in mind. The married family relationship is the fundamental building block in our society, a concept so judicially well recognized it has withstood constitutional attack based on religious freedom in *Reynolds v. United States,* 98 U.S. 145, 165, 25 L.Ed. 244, 250 (1879) ("Upon * * * [marriage] * * * society may be said to be built"). See also *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1824, 18 L.Ed.2d 1010, 1018 (1967). ("Marriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival.") I have found no judicially articulated constitutional right to procreate outside a married setting. Judicial opinions have linked the two together. See *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655, 1660 (1942) ("Marriage and procreation are fundamental to the very existence and survival of the race"); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 1045 (1923) ("Without doubt [the liberty guaranteed by Amendment 14] denotes * * * the right * * * to marry, establish a home and bring up children * * *"); *Planned Parenthood of Central Mo. v. Danforth,* 392 F.Supp. 1362, 1370 (E.D.Mo.1975) ("Procreation has been held to be a fundamental aspect of the marriage relationship").

How is it then that a biological father who has made no legal commitment for the child's benefit, who has taken no responsibility, who has made no investment of pain or risk, and who, at least under today's constitutional interpretations [see *Doe v. Rampton,* 366 F.Supp. 189 (D.Utah 1973)], has no constitutionally protected interest in the child to the moment of birth, suddenly upon such event acquires the full panoply of parental rights?

We are not required in these situations to ignore what we have learned as lawyers and confirmed as judges. The appeals which pass before us substantiate, in most situations, the truth only hypothecated in *Stanley,* 405 U.S. at 654, 92 S.Ct. at 1214, 31 L.Ed.2d at 560, "It may be, as the State insists, that most unmarried fathers are unsuitable and neglectful parents."

I am similarly unimpressed by the argument frequently advanced, that because a non-caring unwed father has certain obligations, it necessarily follows he has all legal parental rights. Those obligations the law rightly imposes (see chapter 675, The Code) evolved out of a concern for illegitimate children, not unwed fathers. So also do the decisions in which courts have protectively struck down statutes discriminating against illegitimate children. See *Gomez v. Perez,* 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973); *Levy v. Louisiana,* 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968). While these decisions reject illegitimacy of the child as permissible classification, neither those cases nor *Stanley,* in my opinion, proscribe a delineation grounded on the unwed and non-caring status of a biological father. Such a classification could hardly be held "suspect" when those biological parents violate a judicially recognized and fundamental public policy. See *Reynolds v. United States,* supra; *Loving v. Virginia,* supra; *Skinner v. Oklahoma,* supra; *Meyer v. Nebraska,* supra.

In the interpretation of our statutes I would therefore impose two burdens on a "putative" and non-caring father who appears following notice in an adoption-related or severance proceeding.

The first obligation would be to establish by competent evidence his status as a biological parent. Neither the State nor a licensed child placing agency in an adoption proceeding should be bound by the word of the frequently distraught or secretive or protective or afraid or simply unsure mother.

It should be sufficient if a petition merely asserted the person given notice is a puta-

tive father who has a potential interest in the child. If the mother names more than one such person, all should be given notice. But the petitioning person or agency should not have the burden of proving which is the father, on penalty of dismissal of the petition if the proof fails. In such a case, trial court should be permitted to find the father is unknown, but nonetheless grant the petition. The same result should obtain where a noticed-in putative father pleads he is the biological father, fails to carry his burden of proof, and from the evidence trial court can discern the identity of no other reputed father who should be brought into the proceeding. Where the noticed-in putative father does not appear, or having appeared, denies he is the biological father, the court, upon finding proper notice and finding no one else who should be noticed in, also ought to be empowered to grant the petition.

A *Stanley*-mandated obligation to give a putative father notice should not relieve him, in asserting a parental interest in the child, from proving the legal ground for his right to make such assertion. This situation does not present the strong presumption of parenthood which prevails in the case of a child born to a married relationship, § 598.31, The Code; *Kuhns v. Olson*, 258 Iowa 1274, 141 N.W.2d 925 (1966); *Nelson v. Nelson*, 249 Iowa 638, 87 N.W.2d 767 (1958); *Bowers v. Bailey*, 237 Iowa 295, 21 N.W.2d 773 (1946). Our statutory law recognizes the speculative nature of an alleged father-child relationship where there is no marriage, § 633.222, The Code. The clause "putative father" so frequently used in majority's opinion and elsewhere in our jurisprudence is an implicit acknowledgment of the difficulty in fixing with any degree of certainty the biological father-child relationship. Webster's Third New International Dictionary (1966) ("*Putative* * * * commonly * * * supposed * * * reputed * * * assumed * * *.")

The second burden I would place on an unwed and non-caring father who has never assumed custody would be to establish his fitness and ability to properly care for and nurture the child. This is a burden beyond that which might satisfy the majority's criterion, which appears to impose an obligation on the father to prove "he has been and is providing for the wants of the child." This does not invoke a conclusive presumption of his incapacity, but rather strips him of the presumption of fitness accorded a biological father who by marriage has shown the maturity and responsibility to make a prior legal commitment to his potential children.

It should be further noted non-conclusive presumptions abound in our law and are frequently helpful in placing a problem in proper perspective. Such presumptions or inferences are found in cases involving grave issues where personal liberty is at stake. They have passed constitutional muster. See *United States v. Johnson*, 466 F.2d 537, 538 (8 Cir. 1972), cert. denied, 409 U.S. 1111, 93 S.Ct. 921, 34 L.Ed.2d 693 (1973) (inference of participation in a crime, from presence, companionship and conduct before and after crime is committed); *State v. Hansen*, 203 N.W.2d 216 (Iowa 1972) (inference arising from the presence of a specified percentage of alcohol in defendant's blood); *State v. Van Voltenburg*, 260 Iowa 200, 147 N.W.2d 869 (1967) (inference or presumption of criminal intent from the possession of burglar tools).

In any event, should this position be interpreted as an imposition of a presumption of unfitness, it is not conclusive and is justified in the mine-run situations above noted. For the one-in-ten-thousand case of the conscientious and qualified biological father, that person shall have the opportunity to present proof and should have little difficulty in establishing his parenting fitness. On the other hand, imposition of these burdens would discourage the troublemakers, the blackmailers, the extortionists, and those who seek custody for the sole purpose of receiving additional A.D.C. payments, and would tend to provide protection for the constitutional rights of the mother and

child and ultimately, the best interests of the child.

REES and HARRIS, JJ., join this special concurrence.

UHLENHOPP, Justice (dissenting in part).

I concur in all of the court's opinion except division IX, from which I dissent in part. I think the court should also address an additional question.

I. I agree that the court's opinion should not apply to adoptions heretofore decreed. But I think the opinion should apply to adoptions which are hereafter decreed. Those adoptions are still open so that notice can be given, indeed, the adoption petition might not yet be filed. But the court holds that notice to a known father is not required if the mother has heretofore released the child for adoption. The facts may be that the mother heretofore released the child, but the child may not be placed in the adoptive home until a year from now and the adoption petition may not be filed for two years from now. I think the adopters should give notice to a known father in such a case the same as any other adopters must give notice. If we dispense with notice to known fathers in adoptions hereafter decreed, we do not give effect to *In re Stanley*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551.

II. Although this case is moot the court has chosen, and rightly I think, to deal with the question of the necessity of notice to a putative father in adoption proceedings. Inevitably, situations will arise in which for some reason the adopters do not notify the child's father although the father's identity is known to the child's mother—for example, when the mother misrepresents the father's identity to the adopters. Since the court has gone as far as it has in the opinion, I think it should say something about those situations, especially since the court says in division VI that an "effective" adjudication cannot be made without notice to a known father.

If a father attacks an adoption decree on the ground of no notice to him, the adopters should be permitted to try to prove that the father did not have the care or provide for the wants of the child—and the father, of course, should be permitted to rebut. If the adopters establish those facts, then the adoption decree should be held an effective adjudication notwithstanding the adopters did not give notice of the adoption proceeding to the father—the father's consent was not necessary in the first place and he has now had his day in court on that issue.