Nanette Dembitz, J.
The New York laws governing the adoption of an out-of-wedlock child treat the father like a nonentity, speaking only of the rights and status of the mother; the father of a legitimate child, however, has similar rights to the mother’s. The unwed father’s challenge to these discriminatory laws in the case at bar, like those brought in other States with similar laws over the past few years, is *296 based, on the seminal United States Supreme Court decision in Stanley v Illinois (405 US 645). Following Stanley, State courts held various laws concerning child adoption unconstitutional on the basis of its doctrine as to the equality of unwed with wed fathers.[1] However, the problem of the unwed versus the wed father must now be freshly analyzed because of Matter of Malpica — Orsini (36 NY2d 568) and the Supreme Court’s recent dismissal of the appeal therefrom "for want of a substantial federal question.” (423 US 1042.)
In Orsini our Court of Appeals, reading Stanley narrowly, upheld by a divided vote a New York provision on adoption which denies to the father of an out-of-wedlock child the rights of a father who sired a child in marriage. The Supreme Court’s dismissal of the appeal on the stated ground must be treated as an affirmance (Mercado v Rockefeller, 502 F2d 666, cert den 420 US 925); Orsini therefore is the law of the land. The case at bar presents the question of the constitutionality of the New York provision authorizing the adoption of an out-of-wedlock child upon its mother’s death without the consent of the father, although the father’s consent is required for adoption of a legitimate child (Social Services Law, § 384, subd 1, par [d]; Domestic Relations Law, § 111). While this provision appeared to be unconstitutional on the basis of Stanley,[2] the issue now presented is the surviving strength of Stanley in the light of Orsini. This court concludes that Orsini’s emphasis on the welfare of children, rather than Stanley’s on the rights of fathers, is controlling; and that the instant discrimination against unwed fathers is, like that in Orsini, constitutional for the purpose of facilitating adoptions of out-of-wedlock children.
I
CONSTITUTIONALITY OF DISCRIMINATION AGAINST UNWED FATHERS
The instant provision for the adoption of an out-of-wedlock child upon its mother’s death, is addressed to different circumstances from those in Orsini. Orsini countenanced the adoption without the consent of the father of an out-of-wedlock *297 child whose live mother desired its adoption by her husband. Because the instant provision relates to a dead mother and live father, it bears some resemblance to the Illinois statute held unconstitutional in Stanley, which provided that "children of unwed fathers become wards of the State upon the death of the mother” (405 US, at p 646). However, this court concludes that the affirmed opinion of the Court of Appeals in Orsini (see above as to meaning of dismissal of appeal) so limits Stanley that it can no longer be deemed controlling in any adoption case; Orsini answers negatively the question suggested by some Judges as to whether Stanley applies in adoption matters to the same extent as in child custody cases.[3]
In Orsini the court emphasized the great benefits of adoption of out-of-wedlock children from a child welfare standpoint, and took heed of the apprehension of experts about the effect on adoptions of " 'the new legalities’ ” engendered by Stanley (36 NY2d, at p 576). With an overall view of the relationship of unwed fathers to their children, the Court of Appeals concluded that beneficial adoptions would be prevented or "[a]t the very least * * * severely impeded” (36 NY2d, at p 572) if unwed fathers had the same veto power over the adoption of their children as wed fathers. On this ground it upheld the constitutionality of discrimination in relation to adoption against unwed fathers as a class, compared to wed fathers; "the primary concern of the Legislature and the courts is with the welfare of the children involved” (36 NY2d, at p 578). The court read the Stanley doctrine of equalizing the rights of unwed fathers with other parents as limited to the situation there considered — where children are removed from the custody of a father who has been living with them. (See 36 NY2d, at pp 576-577; see 405 US, at pp 646-647, 650, n 4, 658; cf. p 667.)
NO EXCEPTION TO ORSINI RULE
Does Orsini permit of an exception in favor of an unwed father’s right to veto his child’s adoption in a case like the instant one, where the mother has died without giving consent to it? While it is true that Orsini mentions the detriment from a child welfare standpoint of a putative father’s right to veto an adoption by the mother’s husband (36 NY2d, at p 573), it is nevertheless clear that the court intended to uphold the laws *298 discriminating against unwed fathers as to all adoptions of out-of-wedlock children; "[t]o contend that at least some of the fathers of children born out of wedlock should be accorded the option or veto of consent is meaningless as far as ameliorating the problem” of impeding adoptions (36 NY2d, at p 576). Indeed, Orsini’s major concern is the benefit of adoptions of out-of-wedlock children by strangers to the mother (36 NY2d, at pp 571-576) in order to secure "homes to the homeless” and "a normal home for a child” (at pp 572, 575).
Further, it would be an unfair discrimination against the children of the poor to erect a barrier to adoption in cases like the instant one of a "destitute” child (see Social Services Law, § 384), as compared to a child like Orsini’s. Nor is there any greater probability of a permanent, stable and beneficial commitment by an unwed father in the case of an out-of-wedlock child who is destitute and dependent on public support upon the death of its mother, than in the case of a child whose mother gives her consent to its adoption but whose father refuses it (as in Orsini).
The detriments that would result from an unwed father’s right to veto an adoption, as described in Orsini, are well illustrated by the instant facts.
Kenneth, born in June, 1970 with narcotics withdrawal symptoms, was placed in August, 1970 with foster parents with whom he has thrived and who wish to adopt him. His mother died in November, 1971; there being no father’s name on his birth certificate and no relative indicating an interest in him, his adoption was obviously desirable and was planned by the foster-care agency.
Kenneth’s putative father asserts that he did not know of Kenneth’s birth because he was incarcerated at the time; that when he was released in August, 1972 he tried to locate Kenneth; that his inability to do so was the reason for his failure to apply to the foster-care agency for visitation with Kenneth until May, 1973.[4]
If a putative father were accorded the rights of other parents, the agency seemingly would have been required in 1973, despite the solidification of a parent-child bond between Kenneth and his foster-parents, to attempt to encourage visits by the father and a contradictory bond between him and Kenneth; and Kenneth could only have been freed for adop *299 tion if an abandonment by the father or quasi-abandonment over a year’s time were thereafter proven (see Social Services Law, § 384, subd 1, par [b]; Family Ct Act, art 6). The evils of such a dilemma for a child would result directly from his illegitimacy. Had Kenneth been born in wedlock, his father’s name would have appeared on his birth certificate; the foster-care agency could and would have ascertained his whereabouts and his intentions; without his consent it would not have encouraged a permanent bond between Kenneth and his foster-parents and his adoption by them; and the father could have immediately found the child upon his release if he wished to do so. As indicated in Orsini, the unwed father’s ignorance, as here, of the child’s birth as well as ignorance on the part of concerned parties as to the father’s identity or whereabouts, is a common condition in the case of out-of-wedlock children; it was one reason for the Orsini holding that adoptions would be greatly impeded by equal rights of unwed with wed fathers (36 NY2d, at p 572).
The Supreme Court’s virtual affirmance of Orsini indicates its acceptance of our Court of Appeals’ reading of Stanley and its approval of Orsini’s elevation of the public interest in the adoption of out-of-wedlock children, as a class, over the claim of a right of veto by unwed fathers.[5] Accordingly, the statute denying the right of veto to the instant unwed father is constitutional and this court can thereunder authorize Kenneth’s adoption without the father’s consent.
II
THE EXTENT OF AN UNWED FATHER’S RIGHT TO A HEARING ON THE BEST INTERESTS OF THE CHILD
While Orsini upheld the legislative denial to unwed fathers of a right to an absolute veto over their children’s adoption, it is subject to the construction that under some circumstances *300 they have a right to a hearing at which they can seek to show that adoption is not in the child’s interest.[6]
Referring to the Supreme Court’s holding that Stanley was " 'as a matter of due process of law * * * entitled to a hearing,’ ” the Court of Appeals observed: "Due process was not lacking here.” It then noted that Orsini had been accorded a hearing in the adoption proceeding and had stipulated that the facts would justify a finding that " 'the overall best interest of the child would warrant’ ” the adoption (36 NY2d, at p 577).
Assuming that the opinion should be construed to mean that due process would have been violated if Orsini had been denied a hearing, it leaves open the question of the coverage of the hearing requirement — that is, whether a putative father under other circumstances than Orsini’s is entitled to a best interests hearing. The circumstances of the father in the case at bar differ in a major respect from Orsini’s; Orsini lived with the mother and child from its birth until it was a year and a-half old, whereas the instant father never lived with the child.
The scope of the hearing requirement must be appraised in the light of Orsini’s holding that judicial reversal of the legislative denial of rights to unwed fathers would discourage adoptions and expose them to uncertainty and delay. These evils would be less if the putative father were only accorded a hearing on the best interests of the child rather than an absolute veto right over the adoption. Nevertheless, substantial uncertainty obviously would be engendered by the possibility that the putative father would prevail on the best interests issue — an issue subject to varying value-judgments as to the significance of the father’s biological connection — or of protracted litigation about it.
Further, adoption agencies and couples who would be beneficial adoptive parents may be discouraged from the undertaking by the mere prospect of confrontation with the putative father. Finally, this court knows from its experience of the delay that would frequently be entailed merely in attempting to locate and serve the putative father.
Thus, in balancing the interest in child welfare so strongly *301 emphasized in Orsini against the rights of the putative father, it is clear that notice and a best interests hearing should be accorded only if there is substantial justification for so burdening the adoption process. It also seems clear that Orsini at the most intended to insure a due process right to a putative father on the basis recognized in Stanley.
The interest protected in Stanley was "that of a man in the children he has sired and raised” (405 US, at p 651).[7] Stanley repeatedly focused on the fact that the unwed father there had raised his children, — indeed had "lived with the two children whose custody is challenged all their lives”; it emphasized "the integrity of the family unit” and the possibility of "familial bonds * * * warm, enduring, and important” between a father and his out-of-wedlock child (405 US, at pp 650, n 4, 651, 652). Thus, Stanley did not intend to contradict the fact that commitment to a child is ordinarily signified by marriage to his mother, but only indicated that caring for the child may be substitute evidence. Certainly Orsini interpreted Stanley to this effect (see 36 NY2d, at pp 576-577).[8] Applying Orsini in the light of Stanley, it therefore seems clear that the mere biological connection of the putative father with the child is insufficient to warrant a hearing from either the standpoint of the father’s rights or the child’s welfare. The likelihood of a full commitment to the child or a familial bond is slight if the father has neither married the mother nor ever lived with the child.
This court therefore concludes that an alleged father’s right to a best interests hearing rests on his unequivocal identification as the father through his acknowledgment of paternity in a paternity proceeding or at least by the use of his name on the birth certificate,[9] together with his cohabitation.[10] The possibility of an "idiosyncratic situation” (36 NY2d, at p 578) in which these conditions are not met but a familial bond betwesn father and child nevertheless prevails, is insufficient to invalidate their imposition, considering the importance of *302 protecting the adoption process by a reasonable classification of the putative fathers entitled to a hearing. Reading Stanley and Orsini together, the protection of that process is a sufficiently "powerful countervailing interest” (Stanley, 405 US, at p 651) to prevail over the claim of right by putative fathers who fail to prove residence with the child.-
CONCLUSION
The claims of the putative father herein through his court-appointed counsel are denied. The child is free for adoption without his putative father’s consent, without efforts by the petitioner foster-care and adoption agency to establish a relationship between him and the child, and without the subsequent institution of an abandonment or quasi-abandonment proceeding against him. Nor is he entitled to notice of the adoption or a hearing in the adoption proceeding as to whether adoption serves the child’s interest. The petition of the foster-care agency for guardianship of the child is granted, so that it may consent to the child’s adoption by his foster-parents.

. People ex rel. Slawek v Covenant Children’s Home, 52 Ill 2d 20; State ex rel. Lewis v Lutheran Social Serv., 59 Wis 2d 1; cf. Catholic Charities v Zalesky, 232 NW2d 539, 546 (Iowa).

. See Matter of Donna P. (80 Misc 2d 129, 132-133).

. E. g., see Catholic Charities v Zalesky, 232 NW2d 539, 551 (Iowa).

. An order of filiation was thereafter entered.

. While the transfer of custody to the State in Stanley may have led under Illinois law to adoption (the term "custody” being used ambiguously in adoption laws), the Supreme Court’s opinion did not advert to this issue. However, its remand between Stanley and Orsini of an adoption case indicated some concern with the application of the Stanley equality doctrine to adoptions. (See order of remand in Rothstein v Lutheran Social Servs., 405 US 1051.)
It must be noted that the Supreme Court affirmed Orsini although the facts as to Orsini’s commitment to the child (see Jones, J., dissenting, 36 NY2d, at pp 589-590), were much stronger than those in the instant case or in the generality of cases of unwed fathers (see 36 NY2d, at p 572).

. It might be contended that Orsini in one sense discriminates in favor of out-of-wedlock children in that a legitimate child’s adoption can be vetoed by his father without regard to its best interests. Compare statutes of other States which do not permit such a parental veto, cited at 36 NY2d, at p 587.

. And see Cleveland Board of Educ. v La Fleur (414 US 632, 639) reviewing constitutional decisions upholding "freedom of personal choice in matters of marriage and family life”.

. See Matter of Negron (33 Ill App 2d 112, —) likewise construing Stanley as based on protection of established family unit.

. See the assumption by the Orsini dissenters that an order of filiation would be a prerequisite to any claim by an alleged father: 36 NY2d, at pp 588-589; Matter of Fernando F., 83 Misc 2d 421, 423.

. Cf. Matter of "Male” L., 82 Misc 2d 345.