John D. Bennett, J.
The mother of the infant in this adoption proceeding commenced a writ of habeas corpus in Nassau County Supreme Court by a petition dated May 10, 1976 and returnable May 26, 1976. The Supreme Court, on the consent of all parties, treated the habeas corpus as an application by the mother to revoke her consent to the adoption of the child and referred the entire matter to this court where all prior proceedings had occurred and where adoption pro *66 ceedings were then pending. The decision also directed the mother to serve a supplemental verified petition setting forth in detail "the basis upon which she claims she was unduly influenced and pressured to give her consent to the adoption.”
In early 1975, the mother, then almost 21 years old and a college student in Florida, became pregnant by an unidentified person other than her present husband, also a college student in Florida, whom she married in August of 1975. In July of that year, in anticipation of her marriage, she first sought an abortion but was informed that her pregnancy had progressed too far. She admitted that her husband would not have married her unless she had agreed to surrender the child for adoption since he did not wish to care for a child not his own and she agreed it was unfair to impose this upon him.
She was referred to an attorney in Miami, Florida and, through him, put in contact with a New York attorney who has represented the adoptive parents in this proceeding. On November 15, 1975, she flew to New York and was met at the airport by a nurse’s aide and housekeeper known to the adoptive parents but who told her she was acting on behalf of the New York attorney. She remained at the housekeeper’s home in Brooklyn until November 26 when the infant was born.
During her first meeting with the New York attorney, she expressed at least two motives for proceeding with the adoption — her desire to devote more time to college and her fear of being unable to care for the child because of her relative youth.
Following the birth of the child, the mother was discharged by the hospital on December 1, the same day the baby was taken to the adoptive parents’ home by the housekeeper. On December 4, both the mother and her husband, he having in the meantime arrived from Florida, met with the attorney. Although she denied signing any papers on that day, at least two documents including an "affidavit of natural parent” and an "agreement of adoption and irrevocable consent” appear to have been signed on December 4 or sworn to by her on that date.
In a telephone conversation with the attorney two days previously, the mother testified that she asked what would happen if she requested the return of the child. The attorney is alleged to have responded that the adoptive parents would do everything they could in an effort to keep the baby and *67 would sue her for all the money that had been paid on her behalf.
During the December 4 meeting, the mother claims to have requested the return of the child and the attorney is alleged to have responded that she would have to pay $8,000 in one week before the baby would be returned to her. The attorney denies that he demanded any sum of money from her but admits indicating that the adoptive parents were emotionally and financially involved, and that a considerable amount of money had been paid up to this point, to which the mother is alleged to have responded: "Money is no problem. My husband has plenty of it” and that she thought she could raise $5,000, to which the attorney made no comment. In addition, he denies threatening to sue her on behalf of the adoptive parents for any sums of money received by her if she refused to go ahead with the adoption. The attorney pictures her as unhappy and primarily concerned about the identity of the adoptive parents. Although she stressed again and again her desire to meet the adoptive parents, the attorney declined, replying that it was unusual to arrange such a meeting and not in the best interests of the parties. Her scheduled appearance before the Surrogate on that date was thereupon canceled at her request and adjourned to the following day.
On December 5, when she again brought up the question of her desire to meet the adoptive parents, the attorney relented and summoned the adoptive father to his office. After initially meeting in the attorney’s office, the mother, her husband and the adoptive father retired to a coffee shop where they conferred further. In her supplemental petition, the mother states that the adoptive father told her that he and his wife had already taken the baby home and that his wife was about to "pass out” at the thought that she could not keep the baby. He assured her that the baby would receive good care and also remarked that the mother could always have more children and it would make them very happy by her agreeing to the adoption. He is also alleged to have promised to let her see the child every year. She admitted that after this discussion she was convinced the adoptive parents could provide a better home and more advantages for the child than she and her husband, which was partly the reason for her conviction to go ahead. When asked to characterize the meeting, she concluded, "He persuaded me to give the baby up.” She returned to the attorney’s office and from there to the court where she *68 reswore to the affidavit of natural parent and reacknowledged the agreement of adoption and irrevocable consent before the Surrogate.
The mother seeks a dismissal of the adoption proceeding on the grounds that (1) jurisdiction was defective because the adoptive parents reside in Suffolk County and not in Nassau County where the proceeding is pending; (2) the consent to adoption was induced by fraud, duress and coercion; (3) notice of the adoption to the unwed father was not given; and (4) the attorney for the respondent acted unlawfully by "placing out” the infant in violation of section 374 of the Social Services Law.
1. Jurisdiction — An adoption proceeding is required to be commenced in the county where the adoptive parents reside or, if they are nonresidents of the State, in the county where the child resides (Domestic Relations Law, § 115, subd 2). The adoptive parents here claim two residences — one in Suffolk County where they reside most of the year and the other in Lido Beach, Nassau County, which is their summer and weekend residence.
The residency requirement in a particular county may relate to venue which is not jurisdictional (Matter of Avon Dairies, 280 App Div 116) or it may be a jurisdictional requirement as in a probate proceeding (see Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 58A, SCPA 206, p 168). If it is merely a venue statute then residence in more than one county is immaterial since for venue purposes a person "resident in more than one county shall be deemed a resident of each such county” (CPLR 503, subd [a]; Generous v Generous, 197 Misc 651). If the requirement is jurisdictional and the term "reside” is synonomous with domicile, then the proceeding has been brought in the wrong county, since a person can have but one domicile at a given time. Such words are often used "even in our statutes, as if they had the same meaning, but they are not identical terms, for a person may have two places of residence, as in the city and country, but only one domicile” (Matter of Newcomb, 192 NY 238, 250).
The traditional problem of jurisdiction as it relates to creation of the adoption status arises not over residence in a particular county but residence, or sometimes domicile, in a particular State (Stumberg, Status of Children in Conflict of Laws, 8 U of Chi L Rev, 42, 50). Residence or domicile in a particular State is said to be important because adoption *69 effects a change of status of the parties, which in turn is governed by the law of the individual’s domicile. Some conflict-of-law commentators urge that it is only the common domicile of both the adoptive parents and the child that can effectively act upon their status (2 Beale, Conflict of Laws, § 142.2; Newbold, Jurisdictional and Social Aspects of Adoption, 11 Minn L Rev 605, 611). This has been criticized as unnecessarily harsh since there might not be adoptive parents available at the child’s domicile, thus depriving the child of the benefits of adoption (Conflict of Laws: Adoption: What law governs the status of parties, 26 Cornell L Q 460, 461).
The first general adoption enactments in New York required that the adoptive parents be residents of the county in which the adoption proceeding was commenced (L 1873, ch 830) but in 1916 this was amended by permitting nonresidents of the State to adopt a child residing in the county which decreed the adoption (L 1916, ch 453). In the intervening period, one decision, in a nonadversary proceeding and without citation of authority, referred to the county of residence as being jurisdictional (Matter of Carpenter, 74 Misc 127). However, in 1927, a New York Surrogate permitted an adoption by Canadian nationals of a New York child (Matter of the Voluntary Adoption of a Minor, 130 Misc 793) notwithstanding his doubts about the recognition of the adoption status in Canada. He concluded (p 796): "Meantime, I see no reason to withhold from this infant the manifest advantage of getting into a good home at once.”
While the modern trend is toward a more liberal construction of jurisdiction in adoptions (Jurisdictional Problem Involved in Adoption, 19 Rocky Mt L Rev 196, 202), one commentator asserts that no case has been found which approves an adoption in a State where none of the parties is domiciled (Goodrich, Conflicts [3d ed], ch 11, § 146). A recent New York case has refused jurisdiction over an adoption under circumstances where it found neither the adoptive parents nor the child domiciled in New York (Matter of Danielle, 88 Misc 2d 78). However, at least one recognized authority has made a very well-reasoned argument that any State which has personal jurisdiction over the parties has jurisdiction to grant an adoption without relation to domicile (Taintor, Adoption in Conflict of Laws, 15 U Pitt L Rev 222, 250). Taintor comments (p 250): "control of the creation of the status rests in jurisdiction of the party, not on any theoretical situs of his status at *70 his domicile.” He argues that Judges, as distinguished from text writers, have much more generally felt that adoption is so likely to be beneficial to the child that they have increasingly tended to disregard technical considerations.
While it has been emphasized that since adoptions are statutory, adoption statutes must therefore be strictly construed (Matter of Mendelsohn, 180 Misc 147; Matter of Anonymous, 47 Misc 2d 139), this rule has become hallowed more by repetition than by intrinsic merit. "The adoption of friendless, dependent or orphaned children tends to conserve the best interests of society and the State * * * It is not the duty of courts to bring the judicial microscope to bear upon such a case in order that every slight defect may be magnified, so that a reason may be found for declaring invalid the proceedings under a beneficent statute of this character.” (Hopkins v Gifford, 309 Ill 363, 368.)
While the New York statute requires residence in the county, the term "reside” has a flexible meaning and must be interpreted in relationship to the subject matter involved (Weintraub, Conflict of Laws, pp 16-17). "The sense in which [residence and domicile] are used in a particular statute may depend upon the subject-matter of the statute as well as the context in which the words are used.” (Rawstorne v Maguire, 265 NY 204, 208.)
The primary purpose of adoption is to promote the welfare of the child. From a sociological viewpoint, however, no adoption should be granted without a careful study and evaluation of the child and the adoptive parents or without a probationary period during which the relationship can be observed before it is finalized (24 Mich L Rev 486, 487). This study and evaluation is "more important than anyone’s domicile, more important than any mechanical or legal connection between any person and any state. Insistance upon connection with any particular state is artificial and irrelevant to the true problem.” (Leflar, American Conflicts of Law, p 579.) Moreover, adoption agencies themselves have viewed the residence or domicile of either the adoptive parents or child as immaterial but "territorially, the placement of children in homes should be restricted to distances within the ready supervision of the organization legally responsible for the child” (19 Rocky Mt L Rev 196, 202, supra).
All of the suggested safeguards have been observed in this case. A study of the child and the adoptive parents has been *71 conducted and a probationary period required. In addition, both of the residences are within close proximity to this court. However, even this last consideration has been held unimportant since it is not the physical "home” as such that necessarily needs to be studied but the character and background of the adoptive parents which should most concern the court (Waller v Ellis, 169 Md 15). In light of the purposes to be served by the adoption statute, the term "reside” must be held to refer merely to venue.
To satisfy the traditional requirements of jurisdiction to create the status of adoption, the adoption must be decreed either by the State of the child’s domicile or that of the adoptive parents (Restatement, Conflict of Laws 2d, § 78; 32 St John’s L Rev 292, 299). Placing those traditional requirements into proper context with the requirement of residence in a particular county, the statute should be interpolated to read: When the adoptive parents are domiciliaries of this State, the proceeding shall be commenced in the county of their residence; when they are nondomiciliaries and the child is a domiciliary, then in the county where the child resides. Since the adoptive parents are domiciliaries of New York and maintain a residence in Nassau County, they have satisfied both the traditional concept of jurisdiction and the venue requirements of the statute. Whether all requirements of domicile in adoptions should be dispensed with as some authorities recommend need not be decided now. Under the facts here, the court has jurisdiction to grant the order of adoption.
2. Fraud, duress and coercion — The allegations of fraud and duress in the supplemental petition filed in this court by direction of the Supreme Court are in summary that: (a) she was depressed and fearful of not being able to take care of her child in a strange city without friends or relations; (b) the housekeeper supervised and controlled her every movement; (c) the attorney demanded $8,000 from her for the return of the child; (d) her husband threatened to leave her and return to his native country, Iran; (e) the adoptive father promised to permit her to see the child every year; and (f) all of her living and transportation expenses were being paid by the adoptive parents.
While the record undoubtedly establishes that the mother was "unhappy” and had misgivings about consenting to the adoption, there is no evidence of any fraud, duress or coercion which would vitiate the irrevocable consent (Matter of T.W.C., *72 38 NY2d 128, affg 48 AD2d 893, affg NYLJ, Dec. 18, 1974, p 17, col 6 [Bennett, J.]). The pivotal incident in the chain of occurrences which establishes her completely voluntary acquiescence to the adoption occurred in her meeting with the adoptive father. There she became satisfied that the adoptive parents could provide better care and more advantages for the child. Her own characterization of this meeting was her conclusion that: "he persuaded me to give the baby up.” While she alleges that the adoptive father promised to permit her to see the child every year, this was denied by him. Even assuming the adoptive father promised visitation, this very question was brought up by her before the Surrogate and, as the minutes of that appearance reveal, she was expressly told that there was no such thing as a conditional adoption, to which she apparently made no comment. That critical moment was the time for her, if she felt it of primary importance, to express her opposition to the adoption. Any objection on her part would have immediately halted all forward movement on the adoption. Instead, the minutes of her appearance before the Surrogate contain affirmative answers to all the questions propounded to her including: whether she acknowledged executing the papers, whether they were truthful and whether her act was free and voluntary. When asked whether her affirmative answer to the last question was truthful when made, she answered: "Well, yes.”
The following quote from this court’s unreported decision in the T.W.C. case (Matter of Anonymous, NYLJ, Dec. 18, 1974, p 17, col 6, supra) bears repetition: " 'Contemplation of the surrender of one’s own child is in many, if not all, cases a cause of emotional and mental stress. Many such surrenders are undoubtedly by mothers of children born out of wedlock and are contemplated because the trying circumstances tend to show that the welfare of the child calls for action at variance with that dictated by natural instincts of maternal love and affection. No statute has said that surrenders are valid only if executed free from emotion, tensions and pressures caused by the situation. No principle of law requires the rule. A balance of the interests of the persons concerned and of society weighs strongly against it.’ ” (Matter of Surrender of Minor Children, 344 Mass 230.)
Provision for an irrevocable consent to adoption was first enacted into law in 1972 by the addition of section 115-b to the Domestic Relations Law. The statute substantially *73 changes the decisional rule of the primacy of parents and their consequent almost unconditional right to withdraw consents voluntarily given without regard to the best interests of the child and the rights of adoptive parents (Matter of Natural Parents v Dumpson, 81 Misc 2d 132 and cases cited; see, also, Kubanoff, Let’s Talk About Adoption, pp 186-191, containing an interesting history of People ex rel. Scarpetta v Spence-Chapin, 28 NY2d 185, and the underlying social concerns which led to legislation emphasizing the child’s best interests and providing for the irrevocability of consents). In addition, subdivision 4 of section 115-b provides that nothing contained within it bars a proceeding by the natural parent to revoke a consent "on the ground of fraud, duress or coercion in the execution or inducement of an adoption consent.” However, lacking proof of fraud, duress or coercion the consent when executed before a Judge becomes irrevocable at that very moment. Understandably, a natural parent can have just as many reservations after giving a consent as before, but the statute puts an end to all such vacillation. Both the mother’s letter of December 27, 1975 to the adoptive parents entered here and the April 21, 1976 letter to the court are prime examples of this kind of vacillation. In asking for the return of her child in the first letter, she states: "I know it sounds like a hard thing to ask, but you cannot imagine how it makes me feel. I feel that my life is over.” In her letter to the court she writes, in part: "We are thinking of trying to get the child back.” (Emphasis supplied.) Neither of the letters complains that the consent was other than voluntary. As the mother herself indicates, the real pressures she faced came not from the persons around her, but from the emotional tensions within. The nature of the irrevocable consent which she executed was made abundantly clear to her. The statute requires that where it is the natural parent’s voluntary and knowledgeable act, it be the moment of truth and the end of indecision.
3. Notice to the Unwed Father — In Stanley v Illinois (405 US 645), a case which has caused widespread controversy over the rights of unmarried fathers, the father was readily identifiable since he had maintained an intermittent relationship with the mother over an extended period of 18 years. In Matter of Malpica-Orsini (36 NY2d 568) the Court of Appeals interpreted Stanley as requiring notice to the father of the proposed adoption but not his consent. There, as in Stanley, *74 the father who had lived with the mother and child for almost two years and admitted paternity in the Family Court, was easily identifiable. Here, the father is no more than a phantom, resurrected at the eleventh hour in an attempt to create a jurisdictional defect. Nowhere in any of the papers, including the birth certificate, is the father’s name even mentioned. When the mother was asked the father’s name during cross-examination, objection was made and, although overruled, the matter was not thereafter pursued, so that even now there is not the slightest information as to the father’s identity.
The interpretation of Stanley as requiring notice to the unknown father equal to that given to the known father has created disturbing ramifications. Children, formerly thought to be free for adoption, now languish in foster care while agencies agonize over the identity of illusive unwed fathers in States such as Illinois, Florida and Georgia; the unwed mothers become uneasy as their privacy is threatened and ultimately alternate and socially undesirable routes to the placing of children become more widespread and disturbing. (The "Strange Boundaries” of Stanley: Providing Notice of Adoption to the Unknown Putative Father, 59 Va L Rev 517, 526.)
Various criteria have regulated the right to notice to the father: Where there is no issue as to paternity (Doe v Department of Soc. Servs., 71 Misc 2d 666) or no issue as to paternity plus cohabitation (Matter of Kenneth M., 87 Misc 2d 295). Notice to the unwed father has also been dispensed with where he is completely unknown and unidentified (Matter of Ferrando F., 83 Misc 2d 421). Similarly, a requirement of publication here would serve no useful purpose and cause only further delay. Section 111-a of the Domestic Relations Law enacted into law by chapter 665 of the Laws of 1976, effective January 1, 1977, prescribes the conditions under which an unwed father is entitled to notice in an adoption proceeding or any proceeding relating to revocation of an adoption consent. While this section is not yet effective, under none of the circumstances set forth in that section would the unwed father be entitled to notice in this case.
The mother’s complete silence as to the father’s identity has been in her own best interest since it has avoided any embarrassing invasion of her privacy. Her self-imposed reticence, however, has now been contrived to appear as the adoptive parents’ fault instead of her own. Her own actions should estop her from complaining of any failure to notify the father *75 (Matter of Martin, 269 App Div 437). Even assuming the failure to notify the father under these circumstances presented any problem, the right to challenge the adoption is a personal right belonging to the father, which may not be exercised by others (Matter of Anonymous, 27 Misc 2d 1031, 1033; Matter of Oddo, 186 Misc 359, 361). No notice of any kind directed to the father who is completely unknown and unidentified will be required.
4. Unlawful Placement — Subdivision 6 of section 374 of the Social Services Law prohibits the payment and receipt of compensation for placing out a child for adoption by anyone other than a licensed agency and the natural mother who may receive her reasonable and actual medical fees for services rendered in connection with the birth of the child.
The term "place out” means to arrange for the free care of a child by a family other than the child’s parent, stepparent, grandparent, brother, sister, uncle or aunt or legal guardian for the purpose of adoption or for the purpose of providing care (Social Services Law, § 371, subd 12).
In commenting on legislation of this type, the report of the Special Committee on Social Welfare and Relief of the Joint Legislative Committee on Interstate Cooperation for the year 1949 (NY Legis Doc, 1949, No. 62, pp 48-49) states: "[T]wo types of placements are possible under present New York State law: (1) placements by authorized agencies, as defined by the Social Welfare Law * * * and (2) placements by parents, guardians or relatives within the second degree, or by intermediaries, acting on behalf of the parent or guardian. This latter group are referred to as 'voluntary’ or 'independent’ placements. Where they involve the payment of money in consideration of the placement, they are commonly referred to as 'black market’ or 'bootleg’ placements.” And again at page 55 of the same report, the following comment is made: "Insofar as the activities of intermediaries are concerned, your Committee believes that where they involve the payment or receipt of money they are unjustifiable and should be prohibited. The buying and selling of human beings was supposed to have been stopped in this country in 1865. Your Committee can see no justification for permitting trafficking in babies.”
For a number of sociological reasons the availability of healthy white babies for adoption has decreased with a corresponding increase in the demand, to an extent that charges up to $50,000 for such a child have been reported (New York *76 Times, April 25, 1976, p 50). The same article refers to organizations of child traffickers co-operating with each other in transporting babies across State lines for profit.
A United States Senate Subcommittee on Children and Youth held public hearings on April 8, 1975, at which evidence was presented of excessive profit making in private-placement adoptions with a flourishing baby-selling business in New York, Florida, Pennsylvania and Ohio (New York Times, April 29, 1975, p 17). Evidence was also presented before that same panel that lawyers often seek out young unwed mothers and offer to pay their living expenses and medical costs in exchange for placing the children with adoptive parents selected by the lawyers who in turn are paid inflated fees. A Miami lawyer testified at the same hearings that he "arranged” adoptions sometimes for a fee of thousands of dollars and that he considered his services "worthwhile.”
The real dangers in private-placement adoptions are the lack of any social concern for the rights of the mother and the failure to select proper adoptive parents for the child. These dangers inherent in private-placement adoptions multiply both in quantity and degree as the profit escalates (Survey of New Jersey Adoption Law, 16 Rutgers L Rev 379, 407).
Various measures have been addressed to these evils, including criminal sanctions, requiring the registration of all children placed in the State at the first instance and, finally, doing away with all private-placement adoptions (Grove, Independent Adoption, The Case for the Gray Market, 13 Villa-nova L Rev 116). Subdivision 6 of section 374 of the Social Services Law is of the criminal-sanction type in that it attempts to prohibit the evils of baby selling by making such activity a crime (Social Services Law, § 389, subd 2). Even if, as the natural mother contends, the New York attorney in cooperation with the Florida attorney illegally placed out this child for compensation, the law makes this a criminal act for which criminal sanctions are prescribed. While Matter of Anonymous (46 Misc 2d 928) came to the opposite conclusion, this court is of the opinion that the adoption itself should not be refused because of a possible violation of a law which calls for a criminal sanction (see, e.g., People v Scopas, 11 NY2d 120; People v Slater, 279 App Div 1042, affd 304 NY 896).
While a violation of subdivision 6 of section 374 of the Social Services Law is a criminal act of which this court does *77 not have jurisdiction, it nevertheless is most concerned about the social evils which can be a danger in private-placement adoptions. One of the prophylactic measures employed in States such as California is a requirement that the attorney report the size of his fee to the adoption court in a verified statement (Grove, Independent Adoption, The Case for the Gray Market, supra, pp 126-127). A special rule in New York County Surrogate’s Court, also designed to minimize the profit motive in adoptions, requires petitioner’s attorney to state the amount of his fee and the number of other adoption proceedings in which he has participated (Gellhorn, Children and Families in the Family Courts, p 250). The court is of the opinion that adoption of such a special rule in this court will provide some assistance in preventing abuses in private-placement adoptions and will recommend its adoption by the Administrative Board of the Judicial Conference (see 22 NYCRR 20.9).
While there may be some difficulty in determining whether a fee charged by a professional man is for his professional services or for the placement itself, nevertheless a fee that is clearly excessive and is not related to the lawyer’s actual services is a violation of the Code of Professional Responsibility (Code of Professional Responsibility, DR2-106; Podolski, Abolishing Baby Buying: Limiting Independent Adoption Placement, 9 Family L Q, 547-552). In addition, the attorney here has admitted that part of his fee was forwarded to the attorney in Florida. It does not appear that the Florida attorney performed any legal services as such other than possibly giving social "counsel” to the mother who was then expecting her child. The Code of Professional Responsibility also prohibits the division of fees among lawyers where the division is not in proportion to the work performed and responsibility assumed (Code of Professional Responsibility, DR2-107). Any clearly excessive fee or improper division of fees should be referred to the proper authorities for investigation and possible criminal or disciplinary proceedings.
In beginning its implementation of its special rule, the attorney here and the adoptive parents, prior to the finalization of the adoption, are directed to file verified statements setting forth the total compensation paid to the attorney. The attorney, in addition, is to verify the amounts paid or forwarded to the Florida attorney. A visit by the adoption caseworker to the Suffolk County home will also be required.
*78 The application of the mother to revoke her consent and for the return of the custody of the child is dismissed.