OPINION OF THE COURT
Maurice E. Strobridge, S.
The child in this private placement adoption proceeding was born on May 16, 1988 shortly after the 19-year-old unwed mother had entered the hospital to give birth. On May 19, while still in the hospital, the mother signed an extrajudicial consent to adoption which had been prepared by an attorney *584 she had retained. Prior to this, the mother had met with and had been counseled by a social worker employed by the hospital. Although she did not know the proposed adoptive parents, they had been described generally to her by a physician who had attended the birth of the child and who knew the adoptive mother as a patient and a fellow employee of the hospital. The social worker had also discussed them with the mother.
Later that day, and with the mother’s permission, the child was discharged from the hospital in the presence of her attorney, after the mother had left the hospital.
Although the mother was to appear at a later date before the Monroe County Surrogate to acknowledge her consent to the adoption, she did not do so, and, on June 29, she filed a timely revocation of the consent after her parents became aware of the birth of the child. Prior to this the parents had not known of their daughter’s pregnancy.
The unwed putative father did not sign a consent to the adoption. While knowing of the mother’s pregnancy, he was unaware, at the time, of the child’s birth or of the mother’s consent to the adoption. He has now belatedly been named on the birth certificate as the father of the child by reason of the filing, pursuant to Public Health Law § 4138, of consensual affidavits sworn to on March 16, 1989 by him and by the mother.
The biological parents maintain that the mother’s consent to the adoption did not comply with the requirements of Domestic Relations Law § 115-b (4), and that, in any event, it was obtained by fraud and duress, and was therefor void ab initio. They also allege that the placement of the child with the adoptive parents did not conform to the requirements for private placement adoptions under Social Services Law § 374 (2) and § 371 (12). Finally, they insist that Domestic Relations Law § 111 (1) (e) and § 115-b are unconstitutional and violative of the biological parents’ due process and equal protection rights under the law. However, that issue was previously determined otherwise by the court.
A hearing was held solely on the questions of the validity of the mother’s consent and of the child’s placement, and the "best interest” hearing mandated by Domestic Relations Law § 115-b was deferred until those issues were resolved.
The court, in deciding these threshold issues, has considered the credible evidence, the written recommendation of the *585 guardian ad litem, and the exhaustive legal memoranda provided by counsel.
As to the question of the validity of the consent, the court finds that it was freely and voluntarily given by the biological mother in compliance with Domestic Relations Law § 115-b. There was no fraud or duress exercised upon her in securing her consent. (See, as cited in the court’s written decision of Jan. 18, 1989, Matter of Sarah K., 66 NY2d 223; Matter of Baby Boy L., 144 AD2d 674; Matter of Podmore v Our Lady of Victory Infant Home, 82 AD2d 48; Matter of E.W.C., 89 Misc 2d 64, and Matter of T.W.C., NYLJ, Dec. 18, 1974, at 17, col 6, affd 48 AD2d 893, affd 38 NY2d 128.) While the mother testified to the coercive nature of the events while she was in the hospital prior to her decision, this testimony was largely contradicted by other witnesses and her testimony was not found to be credible.
The mother apparently had received no prenatal medical care when she entered the hospital shortly before the birth. Although her parents were unaware of her pregnancy, she had discussed her condition with the alleged biological father. It would appear that he was not supportive of her, and played little, if any, part in her decision to allow the child to be adopted. Apparently the only action taken by the mother prior to the birth in arriving at her decision was to make an appointment with an adoption agency, which she did not keep.
Although the biological parents maintain that the mother did not receive proper counseling from the social worker employed by the hospital, primarily because she was not certified by the State, the court finds otherwise. The counselor was a trained and experienced social worker, albeit not certified, and she spent a considerable amount of time with the mother after the birth, in counseling with her and in advising her of her options other than adoption. The mother was also thoroughly and competently advised by her attorney, prior to her signing of the consent, of her options and the legal ramifications of her decision.
The credible evidence also indicates that the mother had made up her mind to place the child for adoption prior to entering the hospital, and, as late as June 1, 1988, she had concluded that she had made the right decision. This is evidenced by letters she wrote on that date to the social worker and to the adoptive parents, the latter being sent to her attorney for delivery to the adoptive parents through their attorney.
*586 Significant, also, is the fact that several days after the mother had left the hospital she came to the hospital to see the social worker. At that meeting the mother told the social worker that she was still confident in her adoption decision. Again, she did not decide to revoke her consent until after her parents learned of the birth.
The more troubling question is whether the "placing out” of the child with the adoptive parents was in compliance with the law. (Social Services Law § 374 [2]; § 371 [12].) The court finds that it was.
Having decided to give up her child for adoption, and knowing that the child would not be placed with an agency for this purpose, the mother authorized her attorney to make the arrangements for discharge of the child from the hospital for delivery to the adoptive parents. To accomplish this, the attorney accompanied a friend of the adoptive parents to the hospital to secure the child. The friend then carried the baby girl from the hospital and transferred her to the adoptive parents.
Section 374 (2) of the Social Services Law provides that: "No person, agency, association, corporation, institution, society or other organization except an authorized agency shall place out or board out any child but the provisions of this section shall not restrict or limit the right of a parent, legal guardian or relative within the second degree to place out or board out a child.”
According to section 371 (12) of the Social Services Law: " 'Place out’ means to arrange for the free care of a child in a family other than that of the child’s parent, step-parent, grandparent, brother, sister, uncle, or aunt or legal guardian, for the purpose of adoption or for the purpose of providing care”.
In addition to the above sections, the court has also considered subdivision (6) of section 374, which was enacted in 1949 as an answer to the very real concerns of the "trafficking” in babies, thé so-called "blackmarket adoptions”, where babies were, in effect, bought and sold for the purpose of adoption. Moreover, severe penal sanctions have been enacted to deter these activities. (See, Social Services Law § 389.)
Prior to the enactment of section 374 (6) the Special Committee on Social Welfare of the Joint Legislative Committee on Interstate Cooperation filed a report with the Legislature which opined that the Committee could "see no justification *587 for permitting trafficking in babies” and declared that "fees paid or received in consideration of the placement of babies in foster homes should be prohibited”. (1949 NY Legis Doc No. 62, at 55.) The Committee’s recommendations were "aimed at persons engaged in buying and selling babies on a more or less commercial scale”. (Id., at 56.)
The only moneys paid for this adoption were the necessary medical and hospital expenses for the mother, which were paid by the adoptive parents. Although the attorney for the mother has requested that he be paid by the adoptive parents for his legal representation of her, the necessity and reasonableness of this request shall be determined later by the court. All of these expenses are properly allowable under Social Services Law § 374 (6).
Matter of Sarah K. (66 NY2d 223, 232, supra) held that any violation of the Social Services Law regarding placement of children for adoption "would be redressed by sanctions against the violators, and would not entitle [the biological parents] to dismissal of the adoption petition.” This same reasoning was enunciated in Matter of Tersigni (Carballo) (137 Misc 2d 553), Matter of Baby E. (104 Misc 2d 185), Matter of Calynn M. G. (137 Misc 2d 1005), Matter of Baby Boy M. G. (135 Misc 2d 252), and Matter of E.W.C. (89 Misc 2d 64, supra).
Although the physician in the delivery room had inquired of the birth mother her intentions in regard to the child, and had received an answer from her that she desired to have the child adopted, his subsequent notification to the adoptive parents of the availability of the child cannot be said to have violated the strictures of the Social Services Law. It was the birth mother’s decision and it was she alone who began the adoption process.
The transfer of the child to the adoptive parents was accomplished by the attorney for the birth mother upon her express request and authorization, and he was thus acting as her agent for this purpose. The fact that the mother did not know the adoptive parents does not negate the validity of the placement. The counseling and advice she received, coupled with the background information imparted to her concerning the adoptive parents, led her to not change her initial decision that adoption was in the best interests of her child. Her attorney was merely the instrument in carrying out her wishes.
Therefore, the court can find no violation of the Social *588 Services Law in the "placing out” of the child. If there was such a violation, it could properly be answered by resorting to the penal sanctions imposed for such activities. Accordingly, the motion to vacate the consent and to dismiss the petition for adoption is denied.
The hearing to determine the best interests of the child pursuant to Domestic Relations Law § 115-b shall be held at the convenience of counsel.